469 A.2d 563

**STANDARD VENETIAN BLIND CO. and Sheldon B. Morris,**

**v.**

**AMERICAN EMPIRE INSURANCE CO., Appellant.**

**Appeal of AMERICAN EMPIRE INSURANCE CO.**

Supreme Court of Pennsylvania.

Argued April 21, 1983.

Decided Dec. 30, 1983.

Reargument Denied Feb. 22, 1984.

Joseph A. Quinn, Jr., Wm. F. Anzalone, Wilkes-Barre, for appellant.

Louis Shaffer, Wilkes-Barre, Mitchell S. Greenspan, Philadelphia, for appellee.

Philip A. Ryan, Philadelphia, amicus curiae.

Before ROBERTS, C.J., and NIX, LARSEN, FLAHER-TY, McDERMOTT, HUTCHINSON and ZAPPALA, JJ.

## OPINION OF THE COURT

ROBERTS, Chief Justice.

This appeal presents the question of whether appellee Standard Venetian Blind Company (Venetian), the insured under a policy of liability insurance issued by appellant American Empire Insurance Company (American), may avoid the effect of a clear and unambiguous exclusion clause in the insurance contract by showing that it was neither made aware of nor understood the effect of the exclusion. We conclude that the lack of knowledge or understanding of a clearly drafted exclusion clause in a written contract of insurance executed by both parties does not render the clause unenforceable. Hence we reverse the Superior Court's determination to the contrary, and remand the record to the Court of Common Pleas of Luzerne County with the direction that judgment be entered in favor of American.

### I

The present controversy has its origin in an action in assumpsit filed by D.H. Evans against Venetian and one of its partners, appellee Sheldon B. Morris, in which Evans sought to recover for damages to a portico installed by a subcontractor of Venetian pursuant to a contract between Venetian and Evans. The portico had been installed in April of 1974 on property owned by Evans, and was destroyed completely in January of 1978 when it collapsed during a heavy snowstorm. The collapse of the portico also caused damage to property owned by Evans which had been stored underneath the portico. Evans' complaint, which alleged breaches of implied and express warranties, sought damages of $13,826.56, the cost of replacing the portico, and additional damages of $880, the cost of repairing the items stored beneath the portico plus the cost of labor needed to remove the collapsed structure.

At the time of the filing of the action in assumpsit, Venetian was the insured under a liability policy issued by American in May of 1975. The contract was executed on behalf of Venetian by appellee Morris and on behalf of American by Boris H. Levitsky, an employee of Block Brothers Insurance Company, which acted as agent for American. The policy, which took effect May 1, 1975, provided personal injury and property damage liability coverage for all "sums which the insured shall be legally obligated to pay as damages...." The policy further provided that American had "the right and the duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage" up to the policy limits.

Immediately below the coverage provision was a section captioned "Exclusions." Under this section, conspicuously displayed and sequentially listed, were set forth the types of claims and losses for which American was not obliged to defend or indemnify Venetian. Exclusions (n) and (*o*) provided:

"This insurance does not apply:

\*   \*   \*   \*   \*   \*

(n) to property damage to the named insured's products arising out of such products;

(*o*) to property damage to work performed by or on behalf of the named insured arising out of the work or any portion thereof or out of materials, parts or equipment furnished in connection therewith."

The policy defined the phrase "named insured's products" as "goods or products manufactured, sold, handled or distributed by the named insured or others trading under his name...."

In a deposition made a part of the record, Sheldon Morris testified that he has a high school education, can read the English language, and has been a self-employed businessman since 1946. He also testified that, although he had received a copy of the policy, he had never read it. He stated that he had not read the policy because he had relied

on the judgment of the Block Brothers Insurance Agency and because he had indicated to Block Brothers that "we wanted full coverage on everything we have."

Immediately upon receiving the complaint in assumpsit, Morris filed answers on behalf of himself and Venetian and promptly notified American of the claim. American agreed, on Venetian's behalf, to indemnify Evans for the cost of the damaged property which had been stored beneath the portico as well as the cost of labor, but refused to defend the assumpsit action or tender payment for the cost of the portico itself. American's refusal was based on its assertion that, while the policy provided coverage for damage caused by products of Venetian, the policy expressly excluded coverage for damage to Venetian's products themselves. Trial then commenced on the breach of warranty action, at the conclusion of which a jury returned a verdict against Venetian and Morris in the amount of $13,094.64.

While trial on the action in assumpsit was still pending, Venetian commenced the present proceedings by filing a petition for a declaratory judgment. The court of common pleas found that exclusions (n) and (o) set forth in the policy were "plain and free of ambiguity," and that these provisions expressly excluded coverage for damage to the portico. Nonetheless, the court of common pleas, relying on language in the Superior Court's decision in *Hionis v. Northern Mutual Insurance Co.*, 230 Pa.Super. 511, 327 A.2d 363 (1974), held that because Venetian had neither been made aware of the exclusions nor had their meaning been explained to it, coverage existed under the policy for the full amount of the judgment entered against Venetian. A panel of the Superior Court affirmed, also on the authority of *Hionis*, and this appeal followed.

## II

The principles governing our interpretation of a contract of insurance are familiar and well settled. The task of interpreting a contract is generally performed by a court rather than by a jury. See *Gonzalez v. United States*

*Steel Corp.*, 484 Pa. 277, 398 A.2d 1378 (1979); *Community College of Beaver County v. Society of the Faculty,* 473 Pa. 576, 375 A.2d 1267 (1977). The goal of that task is, of course, to ascertain the intent of the parties as manifested by the language of the written instrument. See *Mohn v. American Casualty Co. of Reading,* 458 Pa. 576, 326 A.2d 346 (1974). Where a provision of a policy is ambiguous, the policy provision is to be construed in favor of the insured and against the insurer, the drafter of the agreement. See *Mohn v. American Casualty Co. of Reading,* supra. Where, however, the language of the contract is clear and unambiguous, a court is required to give effect to that language. See *Pennsylvania Manufacturers' Ass'n Insurance Co. v. Aetna Casualty & Surety Insurance Co.,* 426 Pa. 453, 233 A.2d 548 (1967). "[I]n the absence of proof of fraud, 'failure to read [the contract] is an unavailing excuse or defense and cannot justify an avoidance, modification or nullification of the contract or any provision thereof.'" *Olson Estate,* 447 Pa. 483, 488, 291 A.2d 95, 98 (1972), quoting *Orner v. T.W. Phillips Gas & Oil Co.,* 401 Pa. 195, 199, 163 A.2d 880, 883 (1960).*

■ Application of these precepts to the insurance contract in this case requires the conclusion that Venetian is bound by the agreement it signed. As found by the court of common pleas, the exclusions at issue are "plain and free of ambiguity," and could have been readily comprehended by Mr. Morris had he chosen to read them. Those provisions expressly excluded coverage for "property damage to the named insured's products arising out of such products," and for "property damage to work performed by or on behalf of the named insured arising out of such work ... or out of materials, parts or equipment furnished in connection therewith," the very types of losses sustained here. It has

---

* As Chief Justice John Bannister Gibson observed, "[i]f a party, who can read ... will not read a deed put before him for execution; or if, being unable to read, will not demand to have it read or explained to him, he is guilty of supine negligence, which ... is not the subject of protection, either in equity or at law." *Greenfield Estate,* 14 Pa. 489, 496 (1850).

not been suggested, much less shown, that either exclusion is contrary to law or to regulations of the Insurance Department. Manifestly, to allow Venetian to avoid application of the clear and unambiguous policy limitations in these circumstances would require us to rewrite the parties' written contract.

In *Hionis v. Northern Mutual Insurance Co.*, 230 Pa.Super. 511, 327 A.2d 363 (1974), upon which both the court of common pleas and the Superior Court relied, the Superior Court stated:

> "[W]here a policy is written in unambiguous terms, the burden of establishing the applicability of the exclusion or limitation involves proof that the insured was aware of the exclusion or limitation and that the effect thereof was explained to him."

230 Pa.Super. at 517, 327 A.2d at 365. Venetian maintains that this Court should adopt this language as a rule of insurance law, as the Superior Court has done here and in other cases decided since *Hionis*. See, e.g., *Kelmo Enterprises, Inc. v. Commercial Union Ins. Co.*, 285 Pa.Super. 13, 426 A.2d 680 (1981); *Klischer v. Nationwide Ins. Co.*, 281 Pa.Super. 292, 422 A.2d 175 (1980). See also *Brokers Title Company, Inc. v. St. Paul Fire and Marine Ins. Co.*, 610 F.2d 1174 (3d Cir.1979).

We believe that the burden imposed by *Hionis* fails to accord proper significance to the written contract, which has historically been the true test of parties' intentions. By focusing on what was and was not said at the time of contract formation rather than on the parties' writing, *Hionis* makes the question of the scope of insurance coverage in any given case depend upon how a factfinder resolves questions of credibility. Such a process, apart from the obvious uncertainty of its results, unnecessarily delays the resolution of controversy, adding only unwanted costs to the cost of procuring insurance. Thus, *Hionis*, which would permit an insured to avoid the application of a clear and unambiguous limitation clause in an insurance contract, is not to be followed.

■ Although on this record we reject *Hionis,* we note that in light of the manifest inequality of bargaining power between an insurance company and a purchaser of insurance, a court may on occasion be justified in deviating from the plain language of a contract of insurance. See 13 Pa.C.S. § 2302 (court may refuse to enforce contract or any clause of contract if court as a matter of law deems the contract or any clause of the contract to have been "unconscionable at the time it was made"). This record does not present such an occasion. We hold only that where, as here, the policy limitation relied upon by the insurer to deny coverage is clearly worded and conspicuously displayed, the insured may not avoid the consequences of that limitation by proof that he failed to read the limitation or that he did not understand it.

The order of the Superior Court is reversed and the record is remanded to the Court of Common Pleas of Luzerne County with the direction that judgment be entered in favor of appellant.

HUTCHINSON, J., files a concurring opinion in which FLAHERTY, J., joins.

NIX, J., files a dissenting opinion.

HUTCHINSON, Justice, concurring.

I concur in the result. I write separately because I believe a general liability policy protects the policyholder by covering him against claims made by third parties for injuries to their person or property resulting from the policyholder's negligence. A liability policy does not provide a guarantee of the policyholder's workmanship.[1] Such a guarantee is not within its coverage. I do not believe a businessman of ordinary intelligence could reasonably ex-

1. Henderson, *Insurance Protection for Products Liability and Completed Operations*—What Every Lawyer Should Know, 50 Nebraska L.Rev. 415, 441 (1971).

pect [2] to obtain a defense against and indemnity for the cost of properly performing his contract or replacing his failed product under a liability policy. Of course, such a holding would not negate general liability coverage for damage to third persons, their property, or the insured's other property, where that damage to others or other property is caused by the insured's improper performance of his contract or his delivery of a defective product. In short, this case involves an absence of coverage itself not an exclusion negating coverage which would otherwise exist. The majority by interpreting the issue in terms of exclusions misses the point.

Appellees, Sheldon B. Morris and Standard Venetian Blind Company, petitioned Common Pleas for a declaratory judgment construing the commercial "comprehensive general liability" policy issued them by appellant, American Empire Insurance Company, as requiring appellant to defend and indemnify them against an assumpsit action brought by D.H. Evans, the purchaser of a portico erected by appellees' subcontractor. In that action Common Pleas ordered appellant to indemnify and to reimburse appellees for the amount of the judgment, costs and reasonable counsel fees. In declaring that appellant's policy provided such coverage, both lower courts relied on the dictum of Superior Court in the case of *Hionis v. Northern Mutual Insurance Company*, 230 Pa.Superior Ct. 511, 327 A.2d 363 (1974) stating:

> Even where a policy is written in unambiguous terms, the burden of establishing the applicability of an exclusion or limitation involves proof that the insured was aware of the exclusion or limitation and that the effect thereof was explained to him.

*Id.*, 230 Pa.Superior Ct. at 517, 327 A.2d at 365.

Having carefully examined the entire policy appellant issued in the context of the whole record, I would not here disturb the lower courts' conclusion that the exclusions, in

**2.** *Selected Risks Insurance Company v. Bruno*, 718 F.2d 67 (3rd Cir. 1983).

and of themselves, are plain and free of ambiguity.[3]  Never-theless, I note that the time and concentration an ordinarily intelligent businessman would have had to spend to review the whole policy to gain an appreciation of the effect of those exclusions, is such that analysis in terms of ambiguity is not truly meaningful.  Moreover, such analysis does not explain the variations in result, in this or other jurisdictions, in cases addressing the scope of coverage a general liability policy affords to a contractor.  Those authorities do reach different results on coverage, depending on whether the occurrence causes damage to third parties, to property other than that which is the subject of the insured's contrac-tual obligation, or damage to the subject of the insured's contractual obligation itself.  Generally the cases find liabil-ity coverage in the first two instances and deny it in the third.  *See Ohio Casualty Insurance Company v. Terrace Enterprises, Inc.,* Minn., 260 N.W.2d 450 (1977), and cases annotated thereunder at 8 A.L.R. 4th 563.

# I

The declaratory judgment action before us on this appeal was precipitated by an action for breach of warranty brought by D.H. Evans against appellees when a portico, furnished and installed by their subcontractor, collapsed in complete destruction causing additional damage to materi-als owned by Evans which he had stored beneath it.  The jury in that assumpsit action returned a verdict against appellees in the amount of $13,094.64, the cost of replacing the portico plus $880.00 for damage to the insured's other property, which $880.00 appellant has tendered to D.H. Evans' attorney.[4]  That verdict was affirmed by the Lu-zerne County Court *en banc.*

Appellees had agreed to furnish the portico to Evans for a price of $9,200.00 and that price had apparently been paid. In his action on that contract Evans asserted breach of both

3.  For the text of the Exclusions (n) and (*o*) which the parties asked the lower courts to consider, *see* p. 311, *infra.*

4.  *See* Appellant's Brief at 5.

express and implied warranties that the portico would not collapse under weights of snow or ice far beyond those seen in the Wilkes-Barre area. In January, 1978, within four years of its installation, the portico collapsed following a heavy snowstorm. D.H. Evans' Complaint pp. 5–8 incl., Reproduced Record at 5a–6a.

Prior to trial in the assumpsit action, appellees petitioned Common Pleas for a declaratory judgment construing the commercial "comprehensive general liability policy" purchased from American Empire Insurance Company in 1975. The policy was written for three years, effective May 1, 1975.[5] The declarations include, under Section II-Business Liability, Limit of Liability, Comprehensive General Liability Insurance:

Description of Hazards
  Premises—Operations
    Metal Goods Mfg. N.O.C.
  Escalators (Number at Premises)
    None at inception
  Independent Contractors
    None at inception
  Completed Operations
    None at inception
  Products
    Metal Goods N.O.C.

Coverage for Completed Operations is specifically said to be non-existent "at inception". Reproduced Record at 50a.

5. The record before us does not show that the parties raised the absence of completed operations coverage apparent on the face of the Section II Schedule, describing the hazards insured against under the liability coverage, Reproduced Record at 50a, below, or objected to the trial court's finding that such coverage existed. *D.H. Evans v. Standard Venetian Blind v. Alcan Aluminum Corporation,* No. 1055 of 1978 (Luzerne County Common Pleas) Slip op. at 3. Moreover, the parties have apparently agreed that the policy at issue is the policy effective at the time the loss occurred and not the policy effective at the time the breach of warranty occurred. Thus, I have assumed that the relevant policy is the one before us and that it included completed operations coverage. However, completed operations coverage is merely liability coverage extended beyond completion.

On printed Form 41426b attached to the policy, entitled Section II, Comprehensive General Liability Standard Form Coverages, the obligation of appellant is described in the following terms:

The Company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of

Coverage A. bodily injury or

Coverage B. property damage

to which this insurance applies, caused by an occurrence, and the Company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but the Company shall not be obligated to pay any claim or judgment or to defend any such suit after the applicable limit of the Company's liability has been exhausted by payment of judgments or settlements.

This indemnity provision is immediately followed by the caption "Exclusions" and a statement that:

This insurance does not apply:

(a) to liability assumed by the insured under any contract or agreement except an incidental contract; but this exclusion does not apply to a warranty of fitness or quality of the named insured's products or a warranty that the work performed by or on behalf of the named insured will be done in a workmanlike manner;

. . . .

(n) to property damage to the named insured's products arising out of such products or any part of such products;

(o) to property damage to work performed by or on behalf of the named insured arising out of the work or

any portion thereof or out of materials, parts or equipment furnished in connection therewith; .... [6]

Reproduced Record at 53a.

Appellant insurance company paid the attorney for D.H. Evans $880.00 to cover damage to the material stored under the portico and for the cost of labor to remove the damaged portico, but declined to defend the breach of warranty action against its insured on the grounds that the policy did not provide coverage for "damage to the named insured's products arising out of such products ...;" or "damage to work performed by or on behalf of the named insured arising out of the work or any portion thereof or out of materials, parts or equipment furnished in connection therewith."

The policy was executed by Sheldon B. Morris on behalf of Standard Venetian Blind Company and by Boris H. Levitsky as agent for Block Brothers Insurance Company. In a deposition made part of this record, Mr. Morris testified that he was a self-employed businessman, who had been doing business with Block Brothers since 1946, that he relied on the agency to place his insurance and that he indicated to Block Brothers that "we wanted full coverage on everything we have." He explained complete and full coverage to mean "that we would be free of any involvement in the thing in the event anything should happen, our fire insurance, our products liability, our contingent liability and all of the items that go into making up these policies." Reproduced Record at 24a and 25a. He testified further that he would regularly instruct Block Brothers' agent to review his policies as needed but he did not know when he had received this policy, although he was sure it was received and filed. He specifically denied ever having read the policy.

6. In all, there are sixteen exclusions. The parties discuss only the effect of Exclusions (n) and (o). They have nowhere discussed or mentioned the meaning or affect of Exclusion (a). In the absence of consideration by the advocates, I am not inclined to speculate on its meaning or any possible ambiguity it imports into the policy.

## II

Both the trial court and Superior Court concluded that this case is governed by the dictum in *Hionis, supra* at p. 568, placing the burden of proving an insured's awareness and understanding of a policy exclusion on the insurer by requiring evidence of an explanation of that exclusion:

> Even where a policy is written in unambiguous terms, the burden of establishing the applicability of an exclusion or limitation involves proof that the insured was aware of the exclusion or limitation and that the effect thereof was explained to him.

230 Pa.Superior Ct. at 517, 327 A.2d at 365. Since *Hionis*, the Superior Court and several of our Courts of Common Pleas have relied[7] on this language to impose liability on a liability insurer, while the federal courts have relied on the traditional Pennsylvania view that the presumption *"contra proferentem"* applies only when the language of a policy is ambiguous. We have not heretofore examined this issue, nor have we previously had occasion to review the Superior Court opinions applying the *Hionis* dictum. Whatever its merits, I do not believe the *Hionis* dictum is the appropriate principle for analysis of this particular case in which this court is called upon to interpret a comprehensive general liability policy purchased by a businessman to protect himself from unexpected and unintended "occurrences" which cause injury to the person or property of another.

Analysis of such policies generally, and this policy particularly, in terms of their clarity to ordinary businessmen has little relevance to the conduct of affairs in the real world. Such policies are ordinarily "clear" and "unambiguous," if at all, only to underwriters, statisticians or actuaries who have expert knowledge in the evaluation and classification of risks. Thus, it strikes me as inappropriate to analyze this case in terms of antedated objective notions of late nineteenth and early twentieth century contract law expressed in terms of meeting of the minds. Moreover, such

7. *E.g., Kelmo Enterprises, Inc. v. Commercial Union Insurance Company*, 285 Pa.Superior Ct. 13, 426 A.2d 680 (1981).

analysis fails to explain the cases in this or other jurisdictions. Recognizing this discrepancy, some courts have analyzed coverage issues involving exclusions of the kind here present in the following terms: Such a "policy contemplates payment generally in situations where the ordinary degree of care is the measure of liability. The premium is determined on that basis." *Royal Indemnity Company v. T.B. Smith*, 121 Ga.App. 272, 275, 173 S.E.2d 738, 740 (1970) quoting F.D. Cooke, Jr., *Care, Custody or Control Exclusions*, [1959] Ins. L.J. 7 at p. 10.

Other courts have over the years expended whole forests analyzing the clarity or ambiguity of these exclusions. *See, e.g.* 8 A.L.R. 4th 563, Annotation on Scope of Clause Excluding from Contractor's or Similar Liability Policy Damage to Property in Care, Custody, or Control of Insured. I agree in part with Presiding Judge Hall of the Court of Appeals of Georgia, Division No. 3, who said:

> [w]e believe the better approach is to examine the purposes of the exclusion in the policy and determine whether this is the type of risk against which the insurance company had not calculated its premiums.
>
> ... 'There are several different reasons for such an exclusion in the policy. Fundamentally, were it not for the exclusion there would be a greater moral hazard as far as the insurance company is concerned. It also eliminates the possibility of the insured making the insurance company a guarantor of its workmanship.'

*Royal Indemnity Company v. T.B. Smith, supra* at 275, 173 S.E.2d at 740.

On the other hand, I do not believe these cases can be decided solely on the basis of the insurer's unilateral analysis and pricing of the risk. Consideration must also be given to the insured's reasonable expectations in purchasing the policy, whether created by the policy language itself or the seller's representations concerning its coverage. This is the conclusion our sister state of New Jersey has reached in construing automobile liability policies. *DiOrio v. New Jersey Manufacturers Insurance Company*, 79 N.J. 257,

398 A.2d 1274 (1979).[8] So viewed it is possible to rationalize the otherwise bewildering results justified by ambiguity, possessory versus proprietary control, presumptions *"contra proferentem"* and other devices which display a certain amount of internal semantic logic but leave the law governing contractor's liability insurance without coherence.

A businessman purchases a liability insurance policy to transfer the risk and cost of unexpected and unintended happenings (occurrences) to his insurance company. The company agrees to assume that risk for a calculated premium. The company does not, however, provide a guarantee of the businessman's workmanship or his products for that premium and typically protects itself against such claims by excluding coverage for property in the care, custody or control of the insured or property as to which the insured for any purpose is exercising control or by language such as we find in Exclusions (n) and (*o*) of the policy before us.[9] "There is usually some form of insurance available to cover injury to or destruction of the excluded property at a higher premium which is commensurate with the risk. The exclusion is to eliminate securing the same coverage under a liability policy at cheaper rates." F.D. Cooke, Jr., *Care, Custody or Control Exclusions, supra.*

In the seventy-one pages summarizing cases on this subject at 8 A.L.R. 4th 563, the insurance carrier has generally had to provide coverage for unanticipated damage to property belonging to a third party but the purchaser of the insurance policy has generally been denied coverage for damage caused by defects in his own workmanship and to his own product.[10] The various rationalizations given for these results are conflicting, sometimes unhelpful and occasionally misleading.

**8.** *Accord., Garber v. Travelers Insurance Companies,* 280 Pa.Superior Ct. 323, 421 A.2d 744 (1980).

**9.** Page 311, *supra.*

**10.** Similar differences in result can be traced in other types of liability policies such as errors and omissions policies.

Our Pennsylvania coverage cases generally fit the pattern of results in the annotated cases but have their semantic underpinnings similarly couched in terms of "ambiguity", "care, custody or control," "strict construction against the insurance company," "adhesion contracts," "equal bargaining power of the parties" and, most recently, the burden of proving "that the insured was aware of the exclusion or limitation and that the effect thereof was explained to him." It is impractical to here review the entire body of Pennsylvania decisions on coverage in this field, but the pattern of results is readily apparent on such review. However, it may be helpful to refer to particular case examples illustrative of the facts distinguishing the results in terms of coverage or noncoverage.

Thus, in *International Derrick and Equipment Company v. Buxbaum*, 240 F.2d 536 (3rd Cir.1957), the Third Circuit Court of Appeals refused to find the insurance company liable for damage to a broadcasting mast which the insured (Buxbaum) had contracted to raise onto a metal tower. The mast was destroyed when the "gin pole," which Buxbaum was using to perform the operation, collapsed dropping the mast to the ground. Although the court refused to find the insurer liable for the unanticipated and unintended destruction of another's property, the result suggests the court viewed the collapse of the "gin pole" as a matter of the contractor's responsibility for his own workmanship.

Following *International Derrick*, the Superior Court in *Masters v. Celina Mutual Insurance*, 209 Pa.Superior Ct. 111, 224 A.2d 774 (1966) held the insured himself, rather than the insurance company, liable for the destruction of a derrick when the cable on the insured contractor's crane snapped during the moving which he had contracted to perform for a third party at a stone quarry. The policy issued by defendant insurer to plaintiff contractor insured for "hazards" including the ownership, maintenance or use of premises and all operations. However, paragraph one of

the policy exclusions provided that the policy did not apply to the injury or destruction of property in the care, custody or control of the insured or property as to which the insured is for any purpose exercising care, custody and control.

In *Slate Construction Company v. Bituminous Casualty Corporation*, 228 Pa.Superior Ct. 1, 323 A.2d 141 (1974), Judge Jacobs construed a construction company's general liability policy. The insured had purchased the policy to provide coverage for its work as a general contractor in constructing a road. A subcontractor was hired to construct certain bridges in the road project. In the course of construction of the road at a time when the subcontractor was in the process of constructing the bridges, the insured's employee negligently damaged portions of a bridge and the insured paid the subcontractor for this damage. The general contractor then sued the insurance company for reimbursement under the policy.

The exclusionary provisions of that policy provided:

This insurance does not apply:

(i) [t]o property damage to

(1) property owned or occupied or rented by the insured,

(2) property used by the insured, or

(3) property in the care, custody or control of the insured or as to which the insured is for any purpose exercising control....

(m) [t]o property damage to work performed on or on behalf of the name insured arising out of the work or any portion thereof, or out of materials, parts or equipment furnished in connection therewith [....]

*Id.*, 228 Pa.Superior Ct. at 4, 323 A.2d at 143. The *Slate* court initially discussed the purpose of exclusion (i)(3):

With respect to the exclusion from coverage of property damage to property in the "care, custody or control" of the insured, one commentator has noted: "There are

several different reasons for such an exclusion in the policy. Fundamentally, were it not for the exclusion there would be a greater moral hazard as far as the insurance company is concerned. It also eliminates the possibility of the insured making the insurance company a guarantor of its workmanship.

"The liability policy contemplates payment generally in situations where the ordinary degree of care is the measure of liability. The premium is determined on that basis. Liability for damage to property in charge of or in the care, custody or control of the insured where there is a bailment is controlled by different rules of law, and as a practical result the hazard is greatly increased.

"There is usually some form of insurance available to cover injury to or destruction of the excluded property at a higher premium which is commensurate with the risk. The exclusion is to eliminate securing the same coverage under a liability policy at cheaper rates." Cooke, Jr., *Care, Custody or Control Exclusions*, 1959 Ins. L.J. 7, 9.

*Id.*, 228 Pa.Superior Ct. at 5–6, 323 A.2d at 144.

Superior Court in *Slate* concluded that a general contractor who delegates some work to a subcontractor regains custody and control only after termination of the subcontractor's work. The case is, therefore, explicable on the theory that the contractor damaged the subcontractor's property and not his own, thus damage to property of a party other than the insured was at issue.

In view of the purposes of the exclusion clause as above recited and the language used in it, we are unable to conclude that the clause is other than ambiguous in the present factual situation. No appreciable increase in moral hazard, guarantee of workmanship, or liability of a bailee is involved in any intended sense of those terms; the construction of the damaged bridge was in fact being conducted by the subcontractor, not the appellee, at the time it was damaged. It has been said that "a general

contractor who delegates some work to a subcontractor regains custody and control over the property within the meaning of the exclusion clause after the termination of the work by the subcontractor." Annot., 62 A.L.R.2d 1242, 1254 (1958). Prior to such time, and under the facts of the present case, we can not say that the applicability of the exclusion is free from doubt.

*Id.*, 228 Pa.Superior Ct. at 7, 323 A.2d at 144–145.

The *Slate* court then affirmed the lower court's finding that neither exclusion in the insurance policy was applicable. Then, with respect to exclusion (m), exclusion from coverage of "property damage to work performed by or on behalf of the insured ..." Judge Jacobs concluded:

It will be noted that only damage to work which arises out of the work, or out of connected materials, parts or equipment, is excluded from coverage. Damage arising in another manner is not.

We are unable to say that the damage to the work under present consideration arose out of that work, as it might have arisen had the bridge been of defective design or construction, or had the damage occurred in the building of the bridge; the source of the damage to the bridge was external to that structure, and unconnected with its construction. Nor does the damage appear to have arisen from materials, parts or equipment connected with the damaged work. We believe, therefore, that the exclusion clause is at best unclear in its application to the present factual situation.

*Id.*, 228 Pa.Superior Ct. at 7–8, 323 A.2d at 145 (footnotes omitted).

In *Pfeiffer v. Grocers Mutual Insurance Co.*, 251 Pa.Superior Ct. 1, 379 A.2d 118 (1977), Judge Hoffman, in construing a demolition company's general liability policy, held "that the 'Declarations' part of the policy and the accompanying Form I 4054s unambiguously limit the coverage of the insurance policy to property or bodily damages arising

from the demolition of the seven specified structures and buildings." *Id.*, 251 Pa.Superior Ct. at 12, 379 A.2d at 124. The court thus refused to find the insurance company liable for the destruction of two buildings belonging to a third party because their demolition resulted from the insured's erroneous execution of its demolition contract and not as an unexpected and unintended occurrence. The insurer had also argued that coverage of the two buildings in question was excluded by a specific exception in the "exclusion section" of the policy. Because it held the policy declarations imposed a similar limitation on the scope of risk the policy covered, Superior Court properly declined to interpret the exclusions clause. *Id.*, 251 Pa.Superior Ct. at 13–14 n. 9, 379 A.2d at 125 n. 9.[11]

In the case at bar, the insurance company has tendered payment for the damage done to the Evans property stored beneath the collapsed portico, but declined to cover the cost of replacing the portico which the insured constructed. Both the trial court and Superior Court have reasoned from the dictum in *Hionis* that the insurance company must provide coverage for the insured's completed operations or defective performance of his contract because it failed to prove that the insured was aware of the exclusions in his policy and failed to explain their effect. I think it more appropriate to focus on whether an insured who is asked to replace or return the price of his own failed product could reasonably expect coverage from his liability carrier. The cases I have examined indicate he cannot. For the forego-

11. Superior Court's reliance on the policy declaration rather than the exclusions seems sound wherever it is possible to do so, since the declarations page is not a completely pre-printed form and thus the insured is more likely to see, read and understand it. In addition the coverages set forth in the policy declarations are normally what the parties actually bargain for and discuss. An insurance carrier should not be permitted to take a bargain plainly promised in the declarations and remove it by artfully drafted and obscure exclusions buried in the text of the policy. This emphasis on the policy declarations is also the underlying rationale for our decisions in *Wzontek v. Zurich*, 418 Pa. 30, 208 A.2d 861 (1965) and *Newman v. Mass. Bonding and Ins. Co.*, 361 Pa. 587, 65 A.2d 417 (1949).

ing reasons, I agree that the order of Superior Court and the judgment of the Court of Common Pleas of Luzerne County should be reversed.

FLAHERTY, J., joins in this opinion.

NIX, Justice, dissenting.

I dissent. The issue in this appeal is whether an exclusion in a liability insurance policy is enforceable. The majority, relying upon standard principles of contract law, focuses upon the question of ambiguity in the policy's language. Mr. Justice Hutchinson in his concurrence suggests the use of a "reasonable expectation" test. In my view both tests are equally nebulous and neither is appropriate in the area of insurance contract interpretation.

An insurance contract is essentially a contract of adhesion. Its terms are not bargained for but rather dictated by the insurer. Thus the insured's awareness and understanding of exclusions set forth in an insurance policy should not be presumed from the mere presence of such exclusions among the policy's terms. The very fact that the insurer prescribes particular exclusions indicates an assumption that the purchaser could otherwise reasonably expect to be covered against the risk so excluded.

It is therefore crucial that the insurer explain and the insured understand the precise nature of the policy's limitations. For this reason I would apply the test adopted by the Superior Court in *Hionis v. Northern Mutual Insurance Co.*, 230 Pa.Super. 511, 327 A.2d 363 (1974), employed by both that court and the trial court in this matter, and hold the insured to a standard of proving the insured was aware of and fully appreciated the effect of exclusions in the insurance policy before permitting the insurer to escape its duty to defend the insured. Because the insurer in the instant case failed to sustain that burden, I would affirm the order of the Superior Court.