Food Choice, Inc. v. Mut. Benefit Ins. Co.

*Howard G. Silverman*, for plaintiff.
*Jacob C. Cohn*, for defendant.

KENNEY, *J.*, March 18, 2011—In the present insurance coverage dispute, both plaintiffs and defendant have moved for partial summary judgment, each motion turning upon the legal definition of a "fixture." Following a through review of the record, the defendant's motion for partial summary judgment, the response and cross-motion for summary judgment of plaintiff, and defendant's reply brief thereto, this court now grants defendant's motion entering partial summary judgment in its favor.

## FACTUAL BACKGROUND

The instant litigation stems from an insurance coverage dispute. Plaintiffs leased a supermarket facility, where a lightning strike damaged the supermarket's refrigeration system. Plaintiffs submitted a claim to its insurer, defendant, wherein defendant denied coverage maintaining the refrigeration system constitutes a fixture, and thus, not covered under the contract. The relevant undisputed facts of this matter are as follows.

Spring Hill Realty Co., PA, L.P. ("Spring Hill") entered into a lease, of certain commercial real estate located in

Upland, Pa, with J.J.E. Upland Food Corp. ("JJE") on April 26, 2004. See, "defendant's motion for partial summary judgment," "exhibit 1" at "exhibit A." The lease entitled Spring Hill to take possession of the premises, improvements, fixtures and JJE's personal property in the event JJE defaulted on the lease terms. See, *id.* at art. 24.1(C). After execution of the lease, JJE converted the premises into a grocery store (the "supermarket"). JJE's conversion of the supermarket included the installation of a refrigeration system. See, *id.* at ¶ 6. The refrigeration system was substantial in nature, consisting of two refrigeration racks, roof mounted condensers, and coolers and freezers installed throughout the supermarket. See, *id.*, "exhibit 2" at ¶ 5-7. The refrigeration system included plumbing throughout the supermarket and its roof, and the electrical system was hardwired into the supermarket's electrical system. See, *id.*

Thereafter, JJE entered into an agreement with Bozzuto's, Inc. to stock the supermarket with goods. Said agreement with Bozzuto's, Inc. was secured by a series of chattel mortgage security agreements, secured by JJE's personal property, which was filed with the Pennsylvania Department of State. See, *id.*, "exhibit 3." Bozzuto's, Inc. retained the right, in the event of JJE defaulting, to enter the supermarket and run the business. See, *id.*, "exhibit 4." In addition, Bozzuto's, Inc., in the event JJE defaulted on its agreement, held the right to enter the supermarket and take possession of JJE's personal property, provided fifteen (15) days notice was given to Spring Hill. See, *id.* at ¶ 4-5.

JJE subsequently defaulted on its lease with Spring

Hill, and the lease was terminated via a confession of judgment and stipulation. See, *id.*, "exhibit 5." JJE also defaulted on its agreement with Bozzuto's, Inc. Notably, neither Spring Hill nor Bozzuto's, Inc. sought to remove any of the fixtures within the supermarket.[2] Moreover, the record lacks any evidence tending to show that Bozzuto's, Inc. served notice on Spring Hill of its intent to remove any of JJE's personal property or fixtures within the supermarket.

Subsequently, Mohamad Mustafa, d/b/a Food Choice, entered into a lease, dated September 25, 2006, with Spring Hill for the Supermarket. See, *id.*, "exhibit 1" at "exhibit C." The lease between Spring Hill and Food Choice did not convey any legal title or interest in the refrigeration system, nor any fixture or furnishing, within the supermarket to Food Choice. See, *id.* Food Choice became concerned a third party may attempt to claim ownership over, and attempt to remove, the fixtures, furnishings and equipment, installed by JJE, within the supermarket. See, *id.*, "exhibit 1" at ¶ 16; "exhibit 6" at 12-13. At the behest of Food Choice, Spring Hill signed an October 18, 2006 letter prepared by Food Choice's attorney, which indicated that Spring Hill, while not waiving any rights afforded to it in the September 25, 2006 lease, was not

_____

2. As evidenced by each party's memorandum of law in support of their respective positions on the instant motions, the parties agree to the following facts: (1) JJE defaulted on its agreement with Bozzuto's, Inc. and (2) neither Spring Hill nor Bozzuto's, Inc. removed any fixtures or any property from the supermarket following JJE's defaulting on both agreements. See, "Memorandum of Law in Support of Defendant's Motion for Partial Summary Judgment" at 5; "Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Partial Summary Judgment and in Support of Cross Motion for Summary Judgment" at 3.

asserting an ownership interest in the fixtures, furnishings and equipment within the supermarket. See, *id.*, "exhibit 1" at ¶ 17; "exhibit 6" at 22. The letter of October 18, 2006 was not intended to, nor did it, convey any ownership in the fixtures, furnishings and equipment to Food Choice from Spring Hill. See, *id.*, "exhibit 1" at ¶ 18; "exhibit 6" at 27; "exhibit 10" at 227.

Pursuant to the terms of the September 25, 2006 lease, Food Choice was required to obtain an insurance policy to cover the "contents, improvements, betterments (contained within the lease structure) as well as the tenant's own financial loss, etc." See, *id.*, "exhibit 1" at "exhibit C", art. 13.1. Spring Hill would insure the building itself with its own policy. See, *id.* Food Choice procured an insurance policy from Mutual Benefit Insurance Company ("Mutual Benefit"), which covered business personal property, business income and liability.[3] See, *id.*, "exhibit 7." Food Choice did not, however, obtain optional "building" coverage, which included "fixtures." See, *id.* Spring Hill, meanwhile, maintained a policy through Ohio Casualty Insurance Company ("Ohio Casualty") to cover the building and all fixtures to the realty.

A lightning strike occurred on or near the supermarket on June 11, 2007, which damaged the refrigeration system. Food Choice retained Young Adjustment Company, Inc. as a public adjuster and immediately notified Mutual Benefit of the claim. Mutual Benefit responded via letter on July 27, 2007 acknowledging that a claim was reported by Food

---

3. Food Choice's policy through Mutual Benefit Insurance Company was issued in the name of "Upland Quality Foods," the registered fictitious name for Food Choice. See, "Memorandum of Law in Support of Defendant's Motion for Partial Summary Judgment" at "Exhibit 7."

Choice for the lightning strike. See, *id.*, "exhibit 9." The July 27, 2007 letter from Mutual Benefit indicated that the $500,000.00 "Business Personal Property" coverage would apply to food spoilage damages, if determined "the damage to the food was caused by or resulting from any covered cause of loss to the compressors [of the refrigeration system]." See, *id.* Mutual Benefit also indicated its intention to issue an advance of $15,000.00 to Food Choice, in addition to the $10,000.00 advanced to Food Choice in June 2007 to help Food Choice but not to waive its investigation. See, *id.* In total, Mutual Benefit paid Food Choice $110,000.00 on its claim.[4] Of the $110,000.00 Mutual Benefit paid to Food Choice on its claim, approximately $20,000.00 was used for personal expenses, including personal mortgage payments, by Food Choice's principal, Mohamad Mustafa.[5]

Following a through investigation, Mutual Benefit concluded that the refrigeration system, specifically the refrigeration racks, constituted fixtures to the real property and thus, not insured under Food Choice's policy.[6] However, in October 27, 2007, Spring Hill submitted a claim to its insurer, Ohio Casualty, for the damage to the refrigeration system. See, *id.*, "exhibit 14." Ohio Casualty eventually paid $78,160.25 on Spring Hill's claim and Spring Hill caused the refrigeration system to be repaired. See, *id.*, "exhibit 15"; "exhibit 1" at ¶ 25. By the time the

---

4. See, "Defendant's Memorandum of Law in Further Support of its Motion for Partial Summary...and in Opposition to Plaintiff's Motion for Summary Judgment on 'Breach of Contract' Claim," "Exhibit 18" at 143-44.

5. See, *id.* at 144.

6. The term "refrigeration racks," as used in this matter, can best be described as the engine that drives the refrigeration system.

refrigeration system was repaired, Food Choice had since vacated the supermarket, and Spring Hill was involved in litigation against Food Choice for past-due rent, among other damages. See, *id.*, "exhibit 11."

## STANDARD FOR SUMMARY JUDGMENT

The Pennsylvania Rules of Civil Procedure provide that an entry of summary judgment is proper if "there is no genuine issue of any material fact as to a necessary element of the...defense which could be established by additional discovery." Pa.R.C.P. 1035.2(1). In an insurance coverage dispute, the interpretation of the scope of coverage of an insurance contract is properly decided by the court as a question of law. *Standard Venetian Blind Co. v. Am. Empire Ins. Co.*, 503 Pa. 300, 304-5, 469 A.2d 563, 566 (Pa. 1983).

Regarding an insurance coverage dispute, our supreme court previously held in *Erie Ins. Exchange v. Transamerican Ins. Co.*:

> In *Warner v. Employers' L. Assur. Corp.* [citation omitted], we said: "while policies of insurance will be construed most strongly against [the] insurer (citation omitted) it is a necessary prerequisite to recovery upon a policy for the insured to show a claim within the coverage provided by the policy." (Citation omitted.) In *Armon v. Aetna Casualty and Surety Co.*, [citation omitted], we held: "A defense based on an exception or exclusion in a policy is an affirmative one, and the burden is cast upon the defendant to establish it." (Citation omitted.) *Erie Ins. Exchange v. Transamerican Ins. Co.*, 533 A.2d 1363, 1366 (Pa. 1987); see also,

*Scottsdale Ins. Co. v. City of Easton*, 379 F. app'x 139, 143 (3d Cir. 2010)

(It is the burden of the insured to make a prima facie showing that the claim falls under the coverage provisions of the policy). However, where the operative provisions of an insurance policy are clear and unambiguous, a court is required to give effect to that language. *Standard Venetian Blind Co.*, at 304-5, 469 A.2d at 566.

## DISCUSSION

Food Choice initiated the present litigation against mutual benefit alleging breach of contract for failure to pay Food Choice's claim on the damaged refrigeration system, as well allegations of bad faith.[7] Mutual Benefit now moves for partial summary judgment as to the breach of contract claim. Mutual Benefit's instant motion turns on two issues — first, the property classification of the refrigeration system, including the refrigeration racks, and secondly, whether that property classification is covered under Food Choice's insurance policy through Mutual Benefit.

*Property Classification of the Refrigeration System*

Turning first to the property classification of the refrigeration system, the facts of record establish that the refrigeration system is a fixture. The laws of this commonwealth treat chattels, used in connection with real estate, as "fixtures" and "personalty." *Lehmann v. Keller*, 684 A.2d 618, 621 (Pa. Super. 1996), citing, *Clayton v. Lienhard*, 312 Pa. 433, 435, 167 A. 321, 322 (Pa. 1933).

---

7. By order dated June 7, 2010, Food Choice's claim for breach of contract was severed and ordered to be tried first to its conclusion.

"[C]hattels that are not physically attached to realty are always personalty." *Id*. Conversely, a "fixture" is described as a chattel which is "annexed to realty in such a manner that [it] cannot be removed without materially damaging either the realty or the chattel." *Id*; see also, *Black's Law Dictionary* 652 (7th ed. 1999) (defining "fixture" as "personal property that is attached to land or a building and that is regarded as an irremovable part of the real property").

A third category also exists, consisting of "those chattels that are physically connected to the real estate but can be removed without material injury to either the land or the chattels." *Id*. Where the third category applies, three considerations must be made to determine a chattel's status as a fixture or personalty. *Shenandoah Mobile Company v. Dauphin County Board of Assessment Appeals*, 869 A.2d 562, 567 (Pa. Cmwlth. 2005), citing, *Appeal of Sheetz, Inc.*, 657 A.2d 1011, 1012-13 (Pa. Cmwlth. 1995). The three considerations include: (1) the manner in which the chattel is physically attached or installed; (2) the extent to which the chattel is essential to the permanent use of the building or other improvement; and (3) the intention of the parties who attached or installed the chattel. *Id.*, citing, *Appeal of Sheetz, Inc.*, 657 A.2d at 1013. The intent of the parties is evidenced by the proven facts and surrounding circumstances entered into evidence. *Lehmann*, 684 A.2d at 621, citing, *Noll v. Harrisburg Area YMCA*, 643 A.2d 81, 88 (Pa. 1994).

In this case, the refrigeration system at issue falls within the third category as described above. The refrigeration system is physically attached to the supermarket, thus it

is not clearly personalty. And although the refrigeration system is physically attached to the supermarket, the refrigeration system conceivably could be moved without materially damaging the supermarket, thus not classifying the system as clearly a fixture. Therefore, the analysis of the third category must be employed to ascertain whether the refrigeration system constitutes a fixture or personalty.

As to the first consideration, the refrigeration system at issue is extensively attached to the supermarket. The system consists of two refrigeration racks, roof-mounted condensers and several freezers and coolers containing evaporator coils. See, "defendant's motion for partial summary judgment," "exhibit 2" at ¶ 5. The refrigeration racks are hardwired into the supermarket's electrical system and supplied with a 120 volt circuit to power the controls and a 480 volt circuit to power the compressors. See, *id.* at ¶ 6. Each refrigeration rack is connected to the supermarket's coolers and condensers on the roof by copper piping. See, *id.* at ¶ 7. Additionally, each refrigeration rack contains more than 584 pounds of refrigerant. See, *id.* at ¶ 8. Given the immense size of the refrigeration system, it would take a number of technicians, working eight plus hours, with heavy machinery including a fork-lift, to remove the system from the supermarket. See, *id.* at ¶ 9-13. Moreover, federal regulations may necessitate replacing a number of components of the supermarket, including piping and roof condensers, if the refrigeration racks were to be replaced. See, *id.* at ¶ 14. Upon review of the foregoing, the refrigeration system is substantially affixed to the supermarket.[8]

---

8. The conclusion that the refrigeration system is substantially affixed to the supermarket is all the more evidenced by the various photographs

As to the second element of consideration, the refrigeration system is essential to the use of the building as a supermarket. Supermarkets are purveyors of a number of chilled and frozen food items. As common sense dictates, keeping these food items chilled and frozen is vital to the general public being able to purchase items that are safe and healthy. Therefore, the refrigeration system at issue is essential to the use of the building as a supermarket.

Lastly, as to the third consideration, the intent of the parties supports the conclusion that the refrigeration system is a fixture. The intention of the parties is determined by evaluating the sound evidence of record. See, *Lehmann*, 684 A.2d at 621 (citation omitted). Similar to *Appeal of Sheetz, Inc.*, the record in this matter is devoid of any showing of intention by any party to remove the refrigeration system should the property cease to be used as a supermarket. See, *Appeal of Sheetz, Inc.*, 657 A.2d at 1014. In fact, the record shows that JJE installed the refrigeration system in the supermarket with the intention to use the facility as a supermarket. The lease between JJE and Spring Hill provided that "all alterations, additions, improvements and fixtures (other than unattached movable trade fixtures) which may be made or installed by either party hereto upon the [supermarket] shall remain upon and be surrendered with the [supermarket] and become the property of [Spring Hill] at the termination of this lease...." See, "defendant's motion for partial summary judgment," "exhibit 1" at "exhibit A", art. 18.2. The

---

of the system, included with the engineering report submitted by the defendant along with its motion for partial summary judgment. See, "Defendant's Motion for Partial Summary Judgment," "Exhibit 2" at "Exhibit A"-"Exhibit D."

JJE-Spring Hill lease also vested Spring Hill with the authority to "re-enter the [supermarket] with due process of law, take possession of all buildings, improvements, additions, alterations, equipment and fixtures thereon..." upon the default of JJE. See, *id.* at art. 24.1(C). The language of the JJE-Spring Hill lease clearly spelled out that the refrigeration system would remain in place at the natural termination of the lease, or in the event the lease is terminated due to JJE's default. Thus, as the lease between JJE and Spring Hill is the best evidence of JJE's and Spring Hill's intention, it is clear that both JJE and Spring Hill intended the refrigeration system to remain in place as part of the premises. see, *Yocca v. Pittsburgh Steelers Sports, Inc.*, 578 Pa. 479, 497, 854 A.2d 425, 436 (Pa. 2004) (citation omitted).

Evaluating the three factors above, the evidence of record establishes that the refrigeration system is a fixture. The refrigeration system is extensively affixed to the Supermarket structure itself. Second, the refrigeration system is critical to the effective use of the premises as a supermarket. And lastly, the evidence clearly establishes that the intent of JJE, the party who installed the refrigeration system, was for the refrigeration system to remain in place. Therefore, the refrigeration system is properly classified as a fixture.

While the refrigeration system is properly classified as a fixture, the plaintiff proffers the argument that the refrigeration system at issue is a trade fixture. Plaintiff's argument, however, contradicts well settled Pennsylvania law. To constitute a trade fixture, the chattel must have been erected for business purposes by the tenant claiming

the chattel to be a trade fixture. See, *Berry, et al. v. Heinel Motors. Inc.*, 56 A.2d 374, 375 (Pa. Super. 1948) ("articles which are erected for business purposes *by a tenant upon the leased premises* are trade fixtures and constitute personal property even though physically annexed to the ground." (citation omitted) (emphasis added)); see also, *Cattie, et al. v. Joseph P. Cattie & Brothers, Inc.*, 403 Pa. 161, 165, 168 A.2d 313, 315 (Pa. 1961) ("as between landlord and tenant the rule is well settled in Pennsylvania that *where a tenant attaches to real estate fixtures and equipment* necessary for the operation of its business, such items become 'trade fixtures', and a presumption arises that the tenant is entitled to remove them during or at the termination of its lease." (citations omitted) (emphasis added)) In this case, the plaintiff's argument that the refrigeration system constitutes its trade fixture must fail, as it was JJE, and not Food Choice, who attached the refrigeration system to the supermarket.[9]

Plaintiff additionally argues that the specific damaged components of the refrigeration system constitute personal property, because the components are easily removable from the refrigeration system. This argument is nothing more than a red herring. The damaged electrical

---

9. The conclusion that refrigeration system was not Food Choice's trade fixture is further supported by the fact that JJE, who installed the system, failed to remove the refrigeration system when JJE vacated the supermarket. As JJE failed to remove the refrigeration system, a presumption arose that JJE intended to "gift" the refrigeration system to its landlord, Spring Hill. See, *Berry, et al.*, 56 A.2d at 375 ("The presumption of the law, being in favor of trade, is that a tenant does not intend to make his trade fixtures part of the realty for the permanent benefit of his landlord, but will remove them before the end of his term; and it is only when he leaves, without removing them, during the term, that an intention of making a gift of them to the landlord is to be imputed to him." (citations omitted)).

components of the refrigeration system, though they may be easily removable from the system, are part and parcel of the refrigeration system as a whole. The fact that the damaged electrical components may be easily removable does not convert them into personalty. See, *Rogers, et al. v. Gillinger, et al.*, 30 Pa. 185, 1858 WL 7809, *3 (Pa. 1858); see also, *Morris's Appeal*, 88 Pa. 368, 1879 WL 11368, *14 (Pa. 1879). The components, as part and parcel of the entire refrigeration system, remain part of the fixture. See, *id.*

Evaluating the evidence of record, the facts establish the refrigeration system to be a fixture. The refrigeration system does not constitute Food Choice's trade fixture, and Food Choice cannot separate out specific components of the refrigeration system into personalty and fixtures. Therefore, the refrigeration system is properly classified as a fixture.

### Covered Items Under the Insurance Contract

As the refrigeration system is determined to be a fixture, the issue becomes whether such fixtures are insurable under Food Choice's insurance contract through Mutual Benefit. The provisions of an insurance contract are properly interpreted by a court as a matter of law. See, *Standard Venetian Blind Co.*, 469 A.2d at 566. While the provisions of coverage of an insurance contract will be most strongly construed in favor of the insured, it is the burden of the insured to establish that the claim falls under the coverage provisions of the insurance policy. See, *Erie Ins. Exchange*, 533 A.2d at 1366; see also, *Scottsdale Ins. Co.*, 379 F. app'x at 143. In interpreting the coverage provisions of the policy, a court is required to give effect

to the contractual language where the operative provisions are clear and unambiguous. See, *Standard Venetian Blind Co.,* 469 A.2d at 566.

In the instant case, Food Choice secured "Business Personal Property" coverage in its policy through Mutual Benefit. See, "defendant's motion for partial summary judgment", "exhibit 7." "Business Personal Property" coverage included: "Tenant's improvements and betterments. Improvements and betterments are fixtures, alterations, installations or additions: (a) made a part of the building or structure you occupy but do not own; and (b) you acquired or made at your expense but cannot legally remove." See, *id.*[10] Food Choice contends that the refrigeration system would be covered under this section of the "Business Personal Property" coverage. See, "plaintiff's response to defendant's motion for partial summary judgment and cross motion for summary judgment on breach of contract claim" at ¶ 16.

Interpreting the aforementioned coverage provision in the light most favorable to Food Choice, the refrigeration system is not covered under this section. True, the refrigeration system is made a part of the supermarket, which Food Choice does not own. However, Food Choice never acquired the refrigeration system, nor did it make it at its own expense. The record clearly establishes that Food Choice never obtained any ownership interest in the refrigeration system. see, "defendant's motion for partial

---

10. The coverage provisions at issue in this case, cited under "Exhibit 7" to "defendant's motion for partial summary judgment," are detailed in the section "Businessowners Coverage Form," Section I(A)(1)(a),(b). See Also, "Defendant's Motion for Partial Summary Judgment," "Exhibit 8".

summary judgment," "exhibit 1" at ¶ 18; "exhibit 6" at 27; "exhibit 10" at 227. Moreover, the record fails to establish any evidence that Food Choice made the refrigeration system at its own expense.[11] Thus, Food Choice's claim for the refrigeration system does not fall within the purview of coverage provided by section 3 of the "Business Personal Property" coverage.

Food Choice's "Business Personal Property" coverage also includes coverage for: "(1) property you own that is used in your business; (2) property of others that is in your care, custody or control, except as otherwise provided in loss payment property loss condition paragraph E.6.d(3)(b);." See, "defendant's motion for partial summary judgment," "exhibit 7." Again, however, interpreting these provisions in the light most favorable to Food Choice, neither section provides coverage for a claim on the refrigeration system. Paragraph (1) of the aforementioned section does not apply, as Food Choice did not own the refrigeration system. see, "defendant's motion for partial summary judgment," "exhibit 1" at ¶ 18; "exhibit 6" at 27; "exhibit 10" at 227. Additionally, paragraph (2) of the aforementioned section does not apply as "property of others" constitutes personalty, and as analyzed above, the refrigeration system constitutes a fixture and thus a

11. Food Choice does contend that it "expended substantial sums of money to make the refrigeration system operational before opening the store." See, "Plaintiff's Response to Defendant's Motion for Partial Summary Judgment and Cross Motion for Summary Judgment on Breach of Contract Claim" at ¶ 16. However, by Food Choice's own testimony, through its principal Mohamad Mustafa, the "$20,000.00" allegedly spent to make the refrigeration system operational was "pretty much" a guess and any records that would support such an allegation were abandoned in the supermarket. See, "Defendant's Memorandum of Law in Further Support of its Motion for Partial Summary Judgment," "Exhibit 18" at 55.

part of the realty. Therefore, Food Choice's claim for the refrigeration system does not fall within the coverage provided by the "Business Personal Property" coverage.[12]

While a claim for the refrigeration system is not covered under the "Business Personal Property" coverage purchased by Food Choice, such a claim would be covered under the provisions of the "building" coverage, which Food Choice neglected to procure. "Building" coverage provides coverage for, among other things, "(2) fixtures, including outdoor fixtures." See, "defendant's motion for partial summary judgment," "exhibit 7." As has been established, the refrigeration system constitutes a fixture. Thus, interpreting the plain language of the insurance contract, a fixture, such as the refrigeration system, would be covered under the aforementioned provision of "Building" coverage.

The language "Businessowners Coverage Form" of Mutual Benefit is clear and unambiguous, and thus the plain language must be given effect. See, *Standard Venetian Blind Co.*, 469 A.2d at 566. The insurance coverage provisions provide that a claim for the refrigeration system would be covered under "building" coverage and not "Business Personal Property" coverage. Thus, as Food Choice only secured "Business Personal Property" coverage, and not "Building" coverage as was its option, the claim for the refrigeration system was not covered under Food Choice's policy through Mutual Benefit. Food Choice neglected to exercise its option to purchase "Building" coverage.

---

12. "Business Personal Property" coverage also includes coverage for "leased personal property" and "exterior building glass," however neither section is applicable to the refrigeration system at issue.

Although hindsight is 20/20, the law will not now remedy Food Choice's failure to purchase "Building" coverage.[13]

## CONCLUSION

The evidence of record establishes the refrigeration system to be a fixture. Interpreting Food Choice's insurance policy in the light most favorable to it, the insurance provisions clearly and unambiguously do not provide coverage for the claim for the refrigeration system. As there exists no genuine issue of material fact, partial summary judgment in favor of Mutual Benefit, as to Food Choice's claim for coverage to the damaged refrigeration system, is proper at this juncture.

## ORDER

And now, March 18, 2011, upon consideration of defendant's motion for partial summary judgment, plaintiffs response in opposition and cross-motion for partial summary judgment, and defendant's sur-reply, it is hereby ordered and decreed that said motion is granted. Plaintiff's claim for coverage for the damage to the refrigeration system, as set forth in plaintiff's complaint at paragraphs 17 through 24, inclusive, and paragraphs 31(d)-(f), are hereby dismissed with prejudice.

It is further ordered and decreed that plaintiff's cross-motion for partial summary judgment is hereby denied.

---

13. It must be noted that Food Choice is essentially seeking a windfall on its claim for the damaged refrigeration system. Spring Hill's insurer, Ohio Casualty, paid Spring Hill's claim for the damaged system and the system was repaired accordingly. Mutual Benefit paid Food Choice $110,000.00 on its claim for business interruption, and instead of Food Choice applying at least some of those payments towards its delinquent rent, $20,000.00 was used for the personal benefit of Food Choice's principal, Mohamad Mustafa.