481 A.2d 947

**Maynard J. PATTERSON, Appellant,**

v.

**RELIANCE INSURANCE COMPANIES.**

Superior Court of Pennsylvania.

Submitted April 30, 1984.

Filed Sept. 7, 1984.

Karl K. Baldys, Williamsport, for appellant.

John A. Carpenter, Sunbury, for appellee.

Before SPAETH, President Judge, and WIEAND and CIRILLO, JJ.

CIRILLO, Judge:

This is an appeal by appellant, Maynard J. Patterson, from a summary judgment entered in favor of appellee. The issue on appeal is whether the personal injury endorsement to Williamsport's general liability policy provided for an obligation to defend additional insureds in criminal actions or to reimburse those insureds for the costs of such a defense. We hold that it did not and thus affirm the summary judgment.

Appellant was the Chief of Police of Williamsport, Pennsylvania from 1974 to 1975. In 1974 appellant was charged in a nine count criminal complaint. A jury found him guilty of five counts. On appeal to the Superior Court the conviction was overturned and the defendant was discharged. *Commonwealth v. Patterson*, 257 Pa.Super. 206, 390 A.2d 784 (1978).

The instant action comes from Chief Patterson's attempt to be reimbursed for the legal fees which were the result of his successful defense. Reimbursement is sought under a general liability policy issued to the City of Williamsport (City) by the Reliance Insurance Company (Reliance). Such a policy had been issued to the City for approximately ten years prior to 1974. However, in the Fall of 1973, during negotiations between the City and the Fraternal Order of Police (F.O.P.) for the 1974 policemen's contract, the F.O.P. for the first time requested "false arrest insurance". This result was due to a recent spate of civil and criminal complaints filed by arrestees as retaliatory actions against officers. In response to this request, the City's general liability insurance policy was amended to include a personal injury endorsement and an extension of coverage to City employees. The endorsement reads, in relevant part:

### 1. COVERAGE P—PERSONAL INJURY LIABILITY

The company will pay on behalf of the Insured all sums which the insured shall become legally obligated to pay as damages because of injury (herein called "personal injury") sustained by any person or organization and arising out of one or more of the following offenses committed in the conduct of the named Insured's business:

**Group A**—false arrest, detention or imprisonment, or malicious prosecution;

**Group B**—the publication or utterance of a libel or slander or of other defamatory or disparaging material, or a publication or utterance in violation of an individual's right of privacy; except publications or utterances in the course of or related to advertising, broadcasting

or telecasting activities conducted by or on behalf of the named Insured;

**Group C**—wrongful entry or eviction, or other invasion of the right of private occupancy;

if such offense is committed during the policy period within the United States of America, its territories or possessions, or Canada, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such personal injury even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but the company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the company's liability has been exhausted by payment of judgments or settlements.

In addition to this printed endorsement, there was a typed addendum defining personal injury for purposes of the policy.

"Personal Injury" means false arrest, erroneous service of civil papers, false imprisonment, malicious prosecution, assault and battery, libel, slander, defamation of character, violation of property rights or deprivation of any rights, privileges, or immunities secured by the Constitution and laws of the United States of America or Canada, for which law enforcement officers may be held liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress: However, no act shall be deemed to be, or result in Personal Injury unless committed in the regular course of duty by the Insured.

Appellant's principal contention is that the policy coverage includes an obligation to defend the insured in criminal actions as well as an obligation to defend and pay damages in civil actions. Appellant raises three specific issues in this regard. First, appellant contends that the language of the policy is ambiguous and requires judicial interpretation. We disagree.

The interpretation of an insurance policy is a question of law for the court. *Timbrook v. Foremost Ins. Co.,* 324 Pa.Super. 384, 471 A.2d 891 (1984). However, a court "may not rewrite an insurance contract or construe clear and unambiguous language to mean other than what it says." *Blocker v. Aetna Casualty and Surety Company,* 232 Pa.Super. 111, 114, 332 A.2d 476, 478 (1975). In determining whether an insurance policy provision is ambiguous, the test to be applied is this: "[a] provision of a policy is ambiguous [only] if reasonably intelligent men on considering it in the context of the entire policy would honestly differ as to its meaning." *Adelman v. State Farm Mutual Automobile Ins. Co.,* 255 Pa.Super. 116, 123, 386 A.2d 535, 538 (1978) *quoting, Celley v. Mutual Benefit Health & Accident Association,* 229 Pa.Super. 475, 481–82, 324 A.2d 430, 434 (1974) (brackets in the original). With this in mind, we must examine that language in the endorsement and addendum which appellant claims creates ambiguity.

Appellant suggests that the use of the word "offense" in the endorsement indicates the intent of the insurer to extend coverage to crimes as well as to torts. This argument is bolstered with the dictionary definition of the word. Appellant's contention that the word carries more the connotation of criminal rather than civil impropriety is correct. However, we must view the word in context. The phrase "the following offenses" precedes a list of eleven torts and is followed by the phrase "such offenses" which refers to the same list. Taken in this context, there can be no doubt as to the meaning of "offense".

Appellant would also have us view the phrase "or other proper proceeding for redress" to include redress through the criminal courts. This we cannot do. Placed as it is within the definition of personal injury and following as it does "[a cause of action] for which law enforcement officers *may be held liable to the party injured* in an action at law, suit in equity or other proper proceeding for redress", the intended meaning of the phrase is clear. Therefore judicial construction is unnecessary.

Additionally, we note that reference to the insured's obligation to defend is conditioned on there being a "suit against the insured *seeking damages* on account of such personal injury." No amount of interpretation is going to make that language suggest an intent to defend in other than a civil action.

Appellant's second issue on appeal is that insurance providing for insured's defense fees and costs is not violative of public policy. However, since the policy in question only contemplates an obligation to defend *civil* suits, appellant's argument is rendered moot.

Appellant's final issue on appeal is that the contract should be reformed due to the existence of a mutual mistake. This issue was not treated by the Court of Common Pleas.

The law with respect to the reformation of instruments is well settled.

> In order to obtain the reformation of a contract in equity, or a variance of the terms of a contract at law, the moving party is required to show by clear, precise and indubitable evidence either fraud or mutual mistake. The meaning of this requirement is that [plaintiffs'] "witnesses must be found to be credible, that the facts to which they testify are distinctly remembered and the details thereof narrated exactly and in due order, and that their testimony is so clear, direct, weighty and convincing as to enable the jury to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." Furthermore, the evidence must be established by *two witnesses* or by one witness and corroborating circumstances. Whether the plaintiffs' evidence met this standard and so justified the submission of their case to the jury is again a question of law for the court.

*Easton v. Washington County Insurance Company,* 391 Pa. 28, 37–38, 137 A.2d 332, 337 (1957) (citations omitted).

■ Following a thorough review of the record, we hold as a matter of law that appellant's evidence does not meet the heavy burden set forth above. The contract negotia-

tions about which appellant's witnesses were deposed occurred nine years prior to the taking of depositions. At the time of the taking of depositions, deponents' memories were less than precise as to the details of the City's purchase of the insurance contract from Reliance in 1973. Exemplary of this is Mr. Bruce Deckard's statement, "I really don't remember the words. This is a long time ago.... And I have no reason to remember them. It wasn't this big a deal at the time. I'm sorry it is now." Dep. at 30–31.

Appellant's evidence of a mutual mistake is not only too ill remembered to meet the required burden; it also is insufficiently convincing so as to enable a jury to come to a clear conviction that what mistakes there were were not unilateral. A brief review of the testimony of the persons who would have been appellant's principal witnesses at trial will serve to illustrate this point.

Stanley Basset, Director of Finance for the City during the time in question, was involved with the negotiations between the City and F.O.P. which resulted in the police contract for 1974. According to his deposition testimony, he was aware of what the F.O.P. negotiator meant when requesting "false arrest insurance".

Q. Again, are you saying to us that you perceived that to mean not only protection of these officers against civil complaints for damages, but also to protect them against criminal complaints or summonses lodged against them and to provide a defense for them?

A. I can't recall what was in my mind as far as civil situations, but I do know with respect to criminal that that was what we were seeking to address ourselves to in securing this coverage, that especially those matters related to criminal complaints that could arise in the normal course of police business.

Dep. at 73.

Mr. Basset directed his deputy, Bruce Deckard, to obtain the requested insurance from George Fetzer, the agent who sold and serviced the City's existing general liability policy. Mr. Deckard's understanding of what "false arrest insur-

ance" meant was more or less the same as Mr. Basset's. "False arrest insurance is false arrest insurance. There's really two types of false arrest insurance. I remember at the time there was trouble with a [sic] or two policemen being falsely accused. I would assume that this was why the union requested this type of coverage." Dep. at 14. However, that may not have been communicated to Mr. Fetzer.

Q. Was the instruction that was given to George Fetzer then by you limited to giving him a copy of the negotiated portion of the contract?

A. No, I was going to go on and say. I don't actually remember the conversation. I don't think that you would have remembered it either, but it's my common method of dealing that I would give him and tell him that the police needed to be covered for false arrests.

Q. Did you go into anymore detail as you recall as to explain to him what you meant? That is, did you describe to him what your different theories of false arrest were?

A. I don't believe so, but I don't really remember.
. . . .
Q. But you don't recall whether you explained to him—

A. I don't recall whether I said to George Fetzer, but I probably thought I didn't have any need to if I did not.
Dep. at 20–21.

Assuming, *arguendo*, that Mr. Deckard communicated the City's desire to protect its police force from civil liability *and* pay for legal fees in criminal actions, that message was apparently not received by Reliance's agent, Fetzer.

Q. Isn't it true, Mr. Fetzer, that Mr. Deckard or someone in the city mentioned some of the situations that the employees were concerned with, the police force in particular; that is to say, different kinds of harrassment or charges being filed against them?

A. The only thing I recall is that they were interested in protecting the police against false arrest. I don't remember anything particular other than that.

Q. Did they define to you what false arrest was?
A. Who did?
Q. Did anyone on behalf of the city?
A. No.
Q. What they understood false arrest to be?
A. No.

Dep. at 48–49.

What the above testimony shows is not clear and convincing enough to warrant the reformation of the policy in question. It hardly demonstrates that both the City and Reliance, through their agents, were operating under a mutual mistake of fact. *See Dudash v. Dudash,* 313 Pa.Super. 547, 460 A.2d 323 (1983). What mistake there was must therefore have been unilateral. "[I]f the mistake is not mutual, but unilateral, and not due to the fault of the party not mistaken, but to the negligence of the party acting under the mistake, no basis for relief has been afforded." *Rusiski v. Pribonic,* 326 Pa.Super. 545, 552, 474 A.2d 624, 627 (1984).

For the foregoing reasons, we affirm the order of the Court of Common Pleas.

ORDER AFFIRMED.