**CARLEY CAPITAL GROUP, et al., Plaintiffs,**

v.

**FIREMAN'S FUND INSURANCE COMPANY, Defendant.**

**Civ. A. No. 86–0023.**

United States District Court, District of Columbia.

Oct. 17, 1986.

Thomas Earl Patton, Robert A. Koons, Jr., Washington, D.C., Wilber L. Kipnes, Philadelphia, Pa., for plaintiffs.

Michael J. Budow, Bethesda, Md., for defendant.

## MEMORANDUM

GESELL, District Judge.

This case is before the Court on cross-motions for summary judgment and concerns the interpretation of a builder's risk insurance policy issued by defendant, covering renovation of a building owned by plaintiffs. During the renovation the building was destroyed by fire. Defendant, relying on its interpretation of the policy, has tendered only partial payment of plaintiffs' insured loss; plaintiff seeks full recovery. The parties have stipulated all material facts. Defendant's liability under the policy is thus an appropriate question for summary judgment.

On June 23, 1983 plaintiffs purchased the six-story Harrison Court Building ("Harrison Court"), located at 1001–23 Filbert Street in Philadelphia, along with the surrounding land, for $3.3 million. Plaintiffs intended to renovate Harrison Court to provide 252,000 square feet of office space around a seven-story brick and glass atrium. The building, built in 1984, was shortly thereafter certified as a historical landmark, thus qualifying its owners for valuable federal tax credits.

On December 28, 1983 plaintiffs, through an insurance broker, took out a builder's risk insurance policy on Harrison Court, with coverage of $20 million with a deductible of $1,000. *See* Complaint, Exhibit A. Paragraph 4 of the Builder's Risk Form ("Form") provided in relevant part that in the event of loss, defendant "shall be liable for the full replacement cost of the property at the time of loss" limited by

the amount of coverage purchased by plaintiff. Paragraph 13, however, specified that this liability limit was a "provisional amount," and on any given date, "the actual Limit of Liability at the Construction Site is that proportion of the provisional amount that the replacement cost of the described property on that date bears to the projected value at the date of completion, but shall not in any case exceed the provisional amount." Paragraph 14 defined the "coinsurance"[1] obligations of plaintiffs in the event they failed to insure the building adequately for a total loss, stating that "in the event of loss [defendant] shall be liable for no greater proportion thereof than the provisional amount of insurance under this policy bears to the projected value of the described property at the date of completion."

On May 3, 1984, during the early stages of renovation, Harrison Court burned to the ground. Plaintiff subsequently filed for recovery of the replacement cost as of that date. After negotiations the parties agreed that the replacement cost of the property at the time of the fire was $13,-200,155, and that the full replacement cost of the property, had the renovations been completed, would have been $22,303,381. Thereafter defendant, relying on these figures, calculated plaintiffs' coinsurance liability under the policy. It concluded plaintiffs were entitled to payment for only about 89.7% of their loss: the proportion that the provisional amount of insurance ($20,000,000) bore to the "projected value" of the building at time of completion ($22,-303,381—the full replacement cost). It therefore reimbursed plaintiffs for $11,-836,909 of the $13,200,155 replacement cost, leaving plaintiffs to absorb $1,362,347 of the loss.

Plaintiffs accepted the payment without waiving their right to seek complete recovery based on their own contrary reading of the policy. In this Court they argue that the "projected value" of the building at date of completion mentioned in Paragraphs 13 and 14 of the Form refers to the *market* value of the building rather than the admittedly higher replacement cost. They suggest that defendant would be justified in its position had it used the words "replacement cost at the date of completion" rather than "projected value" in Paragraphs 13 and 14 of the Form, but that in the absence of this precision the ambiguity should be resolved in their favor. Indicating that the market value was projected as $20,000,000 in an appraisal conducted for its lender, they argue that coinsurance is thus not allowable.

The parties agree that Pennsylvania law controls the interpretation of the policy. Under that law, the goal of insurance policy interpretation is "to ascertain the intent of the parties as manifested by the language of the written instrument." *Standard Venetian Blind Co. v. American Empire Insurance Co.*, 503 Pa. 300, 469 A.2d 563, 566 (1983). In doing so, "[w]here a provision of a policy is ambiguous, the policy provision is to be construed in favor of the insured and against the insurer, the drafter of the agreement." *Id. See also, e.g., Collister v. Nationwide Life Insurance Co.*, 479 Pa. 579, 388 A.2d 1346, 1353 (1978); *Mohn v. American Casualty Co.*, 458 Pa. 576, 326 A.2d 346 (1974); *Blue Anchor Overall Co. v. Pennsylvania Lumbermens Mutual Insurance Co.*, 385 Pa. 394, 123 A.2d 413, 415 (1956).

However, this preference must not be overstated. The Pennsylvania Supreme Court has made clear that "courts do not enjoy a license to rewrite the terms of a policy or to bestow upon the words a construction which clearly conflicts with the accepted and plain meaning of the language used." *Timbrook v. Foremost Insurance Co.*, 324 Pa.Super. 384, 471 A.2d 891, 893 (1984). "Language in a policy that is clear cannot be interpreted to mean other

---

**1.** "Coinsurance" is a term of art in the insurance business. Coinsurance provisions require insurees, if they wish to be fully reimbursed for any partial loss, to purchase insurance adequate to cover the maximum possible loss (or sometimes a fixed percentage thereof) they might sustain. For example, if insurance coverage of $90,000 is purchased on a $100,000 house, a $80,000 loss will not be paid in full; rather, given the 10% shortfall in coverage, the insuree must absorb a coinsurance contribution of $8,000.

than what it plainly says." *Guardian Life Insurance Co. v. Zerance*, 505 Pa. 345, 479 A.2d 949, 953 (1984). Moreover, in interpreting a policy, it " 'must be read in its entirety and the intent gathered from a consideration of the entire instrument.' " *Patton v. Patton*, 413 Pa. 566, 198 A.2d 578, 582 (1964) (citation omitted).

Based on this governing legal framework the Court rejects plaintiffs' reading of the term "projected value" in Paragraphs 13 and 14 of the Form. Viewed in the context of the policy as a whole, the term must be construed as referring to replacement cost; any other reading would render the policy incoherent.

■ That the term "projected value" unambiguously refers to the replacement cost is clear from an analysis of the coinsurance provision of the contract. The effect of such a clause

> is to reduce the liability of an insurer in terms of the percentage of coverage which the clause requires the insured to maintain. That is to say, coinsurance clauses in substance require the insured to maintain insurance on the property covered by the policy in a certain amount, and stipulate that upon his failure to do so, the insured shall be a coinsurer and bear his proportionate part of the loss on the deficit.

16 *Couch on Insurance* § 62:125, at 598 (M. Rhodes rev. 2d ed. 1983) (footnotes omitted). Thus, only when a party has insured against the maximum possible loss may it receive full recovery for a lesser loss; any shortfall in maximum coverage is mirrored by a corresponding reduction in payment for the smaller loss.

Plaintiffs' interpretation of the term "projected value" completely destroys the operation of the coinsurance provision. Plaintiffs acknowledge that they took out a policy that would compensate them on the basis of replacement cost for any loss. *See* Plaintiffs' Memorandum at 14. They admit that the coverage obtained was inadequate to pay for the full replacement cost—that had Harrison Court been "completely destroyed immediately after completion of construction," defendant would have prop-

erly paid "only $20 million because that was the limit of liability." Plaintiffs' Memorandum at 15–16. They do not challenge the framework of the coinsurance provision, which links payout for partial destruction to adequacy of coverage for total loss. They simply present a "value" of the loss that would be incurred by total destruction that is based on a measure different from that used to determine payouts—a value conveniently within their policy coverage.

■ But the principle of coinsurance is clearly based on the assumption that both the partial loss and the maximum loss valuations are based on the same standard; use of different standards destroys the proportionality of coinsurance. Adopting plaintiffs' construction would effectively rewrite the policy to eliminate the coinsurance provision, whose operation is entirely clear and sensible. It would thereby unfairly reward plaintiffs, who have purchased inadequate coverage for total loss but wish full recovery for partial loss.

■ The internal logic of the coinsurance provision, which demonstrates that the term "value" in Paragraphs 13 and 14 of the Form refers to replacement cost, is buttressed by the conventional understanding of the term in this context. The "value" of a building is generally evaluated in terms of replacement cost, not market value. In *Fedas v. Insurance Co.*, 300 Pa. 555, 151 A. 285, 287–88 (1930), for example, the Pennsylvania Supreme Court explained that "actual cash value does not mean market value, as the term is understood. ... Actual cash value in a policy of insurance means what it would cost to replace a building or a chattel as of the date of the fire." *See also Ditch v. Yorktowne Mutual Insurance Company*, 343 Pa.Super. 22, 493 A.2d 782, 784–85 (1985). The same is generally true nationally; "[a]lthough there is some authority to the contrary, the market value test has been rejected as inapplicable to buildings," 15 *Couch on Insurance* § 54:249, at 598 (M. Rhodes rev. 2d ed. 1983) (footnotes omitted). Indeed, plaintiffs recognize that replacement cost valuation is "the only basis that makes sense" for insurance on new construction;

they merely assert that it cannot apply to their situation because the Form "just doesn't fit renovation of an historic building." Plaintiffs' Memorandum at 14. With this statement plaintiffs admit that the policy was one founded on replacement cost; they, of course, must bear the responsibility for entering into an agreement which may not have been to their full advantage.

■ Plaintiffs cannot be exempted from the obvious effect of the coinsurance provision on the ground that they failed to read or understand the policy. Plaintiffs are sophisticated real estate developers, with offices in seven cities. At the time of the Harrison Court renovation they were involved with approximately 20 projects nationwide.[2] Plaintiffs are quite familiar with insurance principles and practices. They obtain coverage for each project they are involved with, normally working through insurance brokers to obtain the best terms.[3] Janine Giordano, who was in charge of all aspects of the renovation and who was involved with obtaining insurance, received a copy of the policy and perused it.[4] However, she reviewed it mainly to be sure that it included $20 million in coverage. She does not recall reviewing Paragraph 14's coinsurance provision, and had no subsequent discussions with defendant about the replacement cost value in the policy.[5] The property had been originally insured for $12 million, but Ms. Giordano increased the amount to $20 million when it became apparent that the "acquisition costs, the construction costs, the financing costs, and anything else you can think of were going to be" at least $20,000,000 for the building.[6] Ms. Giordano believed that the $20 million coverage was for "the value of the building when we finished construction."[7] She expressed her understanding of the term "value" as founded on replacement cost: on "the acquisition cost plus the rehab costs put together to form a new structure that was fully modernized and functional."[8] She does not recall suggesting to anyone that she was basing the $20 million figure on the fair market value of the property.[9]

■ Plaintiffs seek to nullify defendant's reliance on the coinsurance provision, chiding defendant for assuming that they "intended to replace the building merely because [they] obtained a policy that would pay proceeds on the basis of replacement cost." They state that "there is nothing inherently wrong" with defendant's form policy, but that "it just doesn't fit renovation of an historic building," and that "it is clear that [defendant] guessed at the insured's intent and guessed wrong."[10]

This position might carry weight "if judges were psychics who could delve into the parties' minds to ascertain their original intent." But "courts neither claim nor possess psychic power," and therefore in order "to interpret contracts with some consistency ... [and] predictability, the courts must eschew the ideal of ascertaining the parties' subjective intent and instead bind parties by the objective manifestations of their intent." *Mellon Bank, N.A. v. Aetna Business Credit, Inc.,* 619 F.2d 1001, 1009 (3d Cir.1980). In any event, defendant was entitled to rely on its understanding of the policy based on its clear and unambiguous language. It was not required to divine the unexpressed intent of plaintiffs, and plaintiffs cannot avoid the effect of the coinsurance provision by their failure to read the policy. *See Standard Venetian Blind Company, supra* p. 25, 469 A.2d at 566–67.

2. *See* Deposition of Daniel J. McCarty, filed Sept. 8, 1986, at 6–8.

3. *See id.* at 10, 18–19. Plaintiff's chief financial officer was specifically familiar with the operation of coinsurance clauses. *See id.* at 36.

4. *See* Deposition of Janine Giordano, filed September 8, 1986, at 36–37.

5. *See id.* at 37–40.

6. *Id.* at 32–24.

7. *Id.* at 37.

8. *Id.* at 38.

9. *See id.* at 40.

10. Plaintiff's Memorandum at 14.

In accord with the above, defendant's motion for summary judgment is granted, and plaintiffs' motion for summary judgment is denied. An appropriate Order is filed herewith.