**CARLEY CAPITAL GROUP, et al., Appellants**

v.

**FIREMAN'S FUND INSURANCE COMPANY.**

No. 86–7096

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 9, 1987.

Decided June 6, 1989.

---

advanced by the insurer, entered summary judgment in its favor.[3] We find, however, that the policy language is susceptible to another interpretation. Accordingly, we reverse the summary judgment and remand the case to the District Court for further proceedings.

Wilbur L. Kipnes, Philadelphia, Pa., with whom Robert A. Koons, Jr., was on the brief, for appellants. Thomas Earl Patton, Washington, D.C., also entered an appearance for appellants.

Michael J. Budow, with whom Allan A. Noble, Bethesda, Md., was on the brief, for appellee.

Before ROBINSON, RUTH BADER GINSBURG and SILBERMAN, Circuit Judges.

Opinion for the Court filed by Circuit Judge SPOTTSWOOD W. ROBINSON, III.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

This litigation summons judicial construction of a coinsurance clause relating to builder's risk insurance afforded by a policy issued to appellants, the constituents of Harrison Court Associates (HCA),[1] by Fireman's Fund Insurance Company.[2] The District Court, adopting as the unambiguous meaning of the clause the reading

## I

HCA purchased land situated in Philadelphia, Pennsylvania, upon which was a building erected in the late nineteenth century that was eventually certified as an historical landmark.[4] HCA planned to renovate the structure and, to protect its investment during the course thereof, obtained builder's risk insurance from Fireman's Fund.[5] Unfortunately, the building was totally destroyed by fire before the renovation could be completed.[6]

The policy specifies that in the event of a loss Fireman's Fund becomes "liable for the full replacement cost of the property at the time of loss," but not exceeding the maximum amount of insurance,[7] which is $20 million.[8] The coinsurance clause, however, restricts that liability to "no greater proportion [of the loss] than the [$20 million] bears to the projected value of the described property at the date of completion."[9] This clause, of course, compelled HCA to maintain the insurance at that level or risk reduction of the amount payable in the event of a loss.[10]

1. Appellants are Carley Capital Group, David Carley and James Carley, trading as Harrison Court Associates. Carley Capital Group is a general partnership having David Carley and James Carley as its partners. Harrison Court Associates is a limited partnership having Carley Capital Group as its general partner, and David and James Carley as its limited partners.

2. We are informed that the policy covered liability to third parties as well. Brief for Appellants at 5. The record on appeal does not incorporate the policy in its entirety, but does reproduce the builder's risk form (BRF), which contains a schedule and the contractual stipulations bearing on the parties' dispute.

3. *Carley Capital Group v. Fireman's Fund Ins. Co.,* 662 F.Supp. 23 (D.D.C.1986).

4. *Id.* at 24.

5. See Appellants' Record Excerpts (R.E.) Exhibit (Ex.) 2.

6. *Carley Capital Group v. Fireman's Fund Ins. Co., supra* note 3, 662 F.Supp. at 25.

7. BRF ¶ 4, R.E. Ex. 2 at 2.

8. *Id.,* Schedule pt. III, R.E. Ex. 2 at 1.

9. *Id.,* ¶ 14, R.E. Ex. 2 at 3–4.

10. A coinsurance clause requires, as a prerequisite to full recovery for a loss, insurance sufficient in amount to cover a total loss, or a stated percentage thereof, otherwise the insured becomes a coinsurer to the extent of the shortfall. For example, if a $100,000 building is insured for $80,000 and a loss of $10,000 is sustained, the insurer is liable for only $8,000 under a 100% coinsurance clause, as is the one involved

After the fire, the parties agreed that the expense of replacing the building, as it was at the time of loss, was $13,200,155.[11] They agreed, too, that had the renovation been fully accomplished, it would have cost $22,303,381 to replace the structure.[12] They parted company, however, when the coinsurance clause and its "projected value ... at the date of completion" came into play. Fireman's Fund argues that the reference was to the $22–odd million cost of replacing the building had it burned down after renovation was achieved.[13] By this interpretation, HCA, with but $20 million of coverage, was underinsured, and Fireman's Fund was entitled to invoke the coinsurance clause. Accordingly, Fireman's Fund has remitted to appellants only $11,836,909 of the approximately $13 million it would have cost to rebuild after the fire.[14]

HCA, on the other hand, contends that "projected value ... at the date of completion" refers to market value at that time,[15] which HCA believes would have been $20 million.[16] Therefore, HCA says, the building was fully insured in accordance with the terms of the policy and the coinsurance clause was never activated. The District Court, however, entered summary judgment for Fireman's Fund,[17] holding that in the context of the builder's risk insurance afforded, "value" in the coinsurance clause meant replacement cost of the structure upon completion of the renovation.[18] Carley then took this appeal.

## II

The centerpiece of the policy in suit is a "builder's risk form" which contains a schedule identifying the covered property and designating the maximum amount of insurance and the sum deductible therefrom,[19] together with a number of provisions setting forth the insuring agreement,[20] defining the nature and limits of the insurer's liability,[21] and specifying various other terms and conditions shaping the rights and responsibilities of the parties.[22] "This policy," the form states, "insures against all risks of direct physical loss of or damage to the property covered hereunder from any external cause ... except as provided elsewhere in this policy."[23] Other stipulations make it clear that coverage extended to appellants' building[24] at the time of the fire.[25]

The policy also provides that

[t]his Company shall be liable for the full replacement cost of the property at the time of loss, including labor and other charges and expenses accrued thereto but not exceeding the amount which it would cost to repair or replace the property with material of like kind and quality within a reasonable time after such loss; and in no event shall this Company be liable in any one loss for more than the limits stated in the Schedule.[26]

The policy explains that "[t]he Limit of Liability at the Construction Site stated in

here. If the stated coinsurance percentage is 80 or less, the $8,000 loss can be recouped in full. See G. Crouch, Cyclopedia of Insurance Law § 62:125 at 598–599 (M. Rhodes rev. 2d ed. 1983).

11. *Carley Capital Group v. Fireman's Fund Ins. Co., supra* note 3, 662 F.Supp. at 25.

12. *Id.*

13. See Brief for Appellee at 19–35.

14. Brief for Appellants at 7; Brief for Appellee at 5. HCA accepted Fireman's Fund tender but expressly reserved the right to recover the insurer's deduction for coinsurance.

15. Brief for Appellants at 11–15.

16. See R.E. Ex. 4 at 33, 37–38; R.E. Ex. 5 at 29–31; R.E. Ex. 6 at 40–41; *Carley Capital*

*Group v. Fireman's Fund Ins. Co., supra* note 3, 662 F.Supp. at 25. But see note 44 *infra*.

17. *Carley Capital Group v. Fireman's Fund Ins. Co., supra* note 3, 662 F.Supp. at 28.

18. *Id.* at 26–27.

19. R.E. Ex. 2 at 1.

20. *Id.* ¶ 7, R.E. Ex. 2 at 2.

21. *Id.* ¶¶ 4, 7, 13, R.E. Ex. 2 at 2, 3.

22. See BRF, R.E. Ex. 2.

23. *Id.* ¶ 7, R.E. Ex. 2 at 2.

24. *Id.* ¶¶ 1, 2, R.E. Ex. 2 at 2.

25. *Id.* ¶ 3, R.E. Ex. 2 at 2.

26. *Id.* ¶ 4, R.E. Ex. 2 at 2.

the Schedule is a provisional amount," [27] and that "the rate and premium are based on an average amount of liability during the period of construction." [28] It further provides that

> [i]t is a condition of this insurance ... that on any date while this policy is in force, the actual Limit of Liability at the Construction Site is that proportion of the provisional amount that the replacement cost of the described property on that date bears to the projected value at the date of completion, but shall not in any case exceed the provisional amount.[29]

And lastly, for purposes of this case, there is the coinsurance clause:

> In consideration of the reduced rate at which this policy is written, it is a condition of this insurance that in the event of loss, this Company shall be liable for no greater proportion thereof than the provisional amount of insurance under this policy bears to the projected value of the described property at the date of completion....[30]

It is common ground that Pennsylvania law governs this case,[31] and in the law of that state several highly relevant propositions are prominent. The "goal is ... to ascertain the intent of the parties as manifested by the language of the written instrument." [32] The policy "must be read in its entirety and the intent gathered from a consideration of the entire instrument." [33] Policy language must be given its plain meaning,[34] and while "court[s] should read policy provisions to avoid ambiguities if possible ... [they] should not torture the language to create them." [35] A clause is deemed ambiguous " 'if reasonably intelligent men on considering it in the context of the entire policy would honestly differ as to its meaning.' " [36] Any ambiguity must be resolved against the insurer, the drafter of the policy.[37]

If the phrase "projected value ... at the time of completion" refers unequivocally to either replacement value or market value, it must be honored accordingly. If, on the other hand, that language leaves its meaning doubtful, the search must continue. Fully mindful of the controlling effect of Pennsylvania law and of the constructional canons it embodies, we turn once again to the policy provisions.

## III

█ The insuring agreement in the builder's risk form extends protection "against all risks of direct physical loss or damage to the property covered ... except as pro-

---

27. *Id.* ¶ 13, R.E. Ex. 2 at 3.

28. *Id.*

29. *Id.*

30. *Id.* ¶ 14, R.E. Ex. 2 at 3–4.

31. The jurisdiction of the District Court was founded upon the diverse citizenship of the parties. See 28 U.S.C. § 1332 (1982).

32. *Gene & Harvey Builders v. Pennsylvania Mfrs. Ass'n Ins. Co.,* 512 Pa. 420, 517 A.2d 910, 913 (1986); accord, *Standard Venetian Blind Co. v. American Empire Ins. Co.,* 503 Pa. 300, 469 A.2d 563, 566 (1983); *Mohn v. American Cas. Co.,* 458 Pa. 576, 326 A.2d 346, 351 (1974).

33. *Patton v. Patton,* 413 Pa. 566, 198 A.2d 578, 582 (1964) (citation omitted).

34. *Guardian Life Ins. Co. v. Zerance,* 505 Pa. 345, 479 A.2d 949, 953 (1984); *Standard Venetian Blind Co. v. American Empire Ins. Co., supra* note 32, 469 A.2d at 566; *United States*

*Fidelity & Guar. Co. v. Griggs,* 341 Pa.Super. 286, 491 A.2d 267, 269 (1985).

35. *Spezialetti v. Pacific Employers Ins. Co.,* 759 F.2d 1139, 1142 (3d Cir.1985) (applying Pennsylvania law); accord, *St. Paul Fire & Marine Ins. Co. v. United States Fire Ins. Co.,* 655 F.2d 521, 524 (3d Cir.1981) (same).

36. *Patterson v. Reliance Ins. Cos.,* 332 Pa.Super. 592, 481 A.2d 947, 949 (1984) (quoting *Adelman v. State Farm Mut. Auto. Ins. Co.,* 255 Pa.Super. 116, 386 A.2d 535, 538 (1978)) (in turn quoting *Celley v. Mutual Benefit Health & Accident Ass'n,* 229 Pa.Super. 475, 324 A.2d 430, 434 (1974)); accord, *United States Fidelity and Guar. Co. v. Griggs, supra* note 34, 491 A.2d at 269; *Timbrook v. Foremost Ins. Co.,* 324 Pa.Super. 384, 471 A.2d 891, 893 (1984).

37. *D'Allessandro v. Durham Life Ins. Co.,* 503 Pa. 33, 467 A.2d 1303, 1305 (1983); *Techalloy Co. v. Reliance Ins. Co.,* 338 Pa.Super. 1, 487 A.2d 820, 823 (1984); *State Farm Ins. Co. v. Bullock,* 316 Pa.Super. 475, 463 A.2d 463, 467 (1983).

vided elsewhere in [the] policy." [38] We perceive nothing in this provision, in those specifying property coverage,[39] or in the risk [40] and property [41] exclusions, that contributes to the solution of the problem at hand.

When we proceed to the next stage of our examination, the insurer's undertaking becomes more apparent, but nothing beyond that is actually accomplished. Putting aside for the moment the coinsurance clause and the ceiling fixed in the policy schedule, the liability assumed by Fireman's Fund is gauged by "the full replacement cost of the property at the time of loss," [42] and is not to "exceed[ ] the amount which it would cost to repair or replace the property with material of like kind and quality within a reasonable time after such loss." [43] These provisions do not, however, stake out the interpretation properly to be placed upon the phrase "projected value . . . at the time of completion," as used in the coinsurance clause. That clause does not undertake to define the nature of the insurer's liability; its role, instead, is simply to decrease that liability if the demand specified in the clause is not met. This functional difference points up the independence of the two provisions. We are not aware of any consideration, legal or logical, calling inexorably for formulation of both on the same criteria.[44] Like other components of the policy contract, liability and coinsurance stipulations are whatever the parties choose to make them. The mere

fact that the insurer's liability is to be measured by replacement cost does not preclude a coinsurance clause operative on the basis of market value. That the insurer's liability may be measured one way and the coinsurance requirement another way does not create any disharmony within the policy contract.

We are unable to detect in the remaining provisions of the policy any support for the District Court's conclusion that "projected value" in the coinsurance clause unambiguously connotes replacement cost. Indeed, one feature of those provisions demonstrates quite the contrary. "The rate and premium," the policy informs us, "are based on an average amount of liability during the period of construction." [45] The insurer's liability increases steadily, of course, as the construction project progresses from zero to full completion, and "[t]he Limit of Liability at the Construction Site stated in the Schedule," the policy states, "is a provisional amount." [46] "[T]he actual Limit of Liability at the Construction Site," the policy continues, "is that proportion of the provisional amount that the *replacement cost* of the described property on that date bears to the *projected value* at the time of completion, but shall not in any case exceed the provisional amount." [47] What is striking about this explanation is that both "replacement cost" and "projected value" are used in the very same sentence. This juxtaposition of

**38.** BRF ¶ 7, R.E. Ex. 2 at 2.

**39.** *Id.* ¶ 1, R.E. Ex. 2 at 2.

**40.** *Id.* ¶ 8, R.E. Ex. 2 at 2–3.

**41.** *Id.* ¶ 2, R.E. Ex. 2 at 2.

**42.** *Id.* ¶ 4, R.E. Ex. 2 at 2.

**43.** *Id.*

**44.** The District Court felt that "only when a party has insured against the maximum possible loss may it receive full recovery for a lesser loss," *Carley Capital Group v. Fireman's Fund Ins. Co., supra* note 3, 662 F.Supp. at 26; "any shortfall in maximum coverage is mirrored by a corresponding reduction in payment for the smaller loss." *Id.* HCA apparently at one time had conceded that the full replacement cost of

its building was more than $20 million. *Id.* The court reasoned that "the principle of coinsurance is clearly based on the assumption that both the partial loss and the maximum loss valuations are based on the same standard; use of different standards destroys the proportionality of coinsurance." *Id.* But this would be true only if replacement cost always exceeds market value—a proposition we are not prepared to accept. And the mere fact that the insurer's liability is to be measured one way and the coinsurance requirement another way does not create any disharmony within the policy contract.

**45.** BRF ¶ 13, R.E. Ex. 2 at 3.

**46.** *Id.*

**47.** *Id.* (emphasis added). .

"cost" and "value"—which are entirely different concepts in the business world—suggests strongly that they have different meanings in the builder's risk form that would match common usage of "replacement cost" and "value" perfectly. Webster defines "replacement cost" as "current cost of replacing a fixed asset with a new one of equal effectiveness," [48] and "value" as "the amount of a commodity, service, or medium of exchange that is the equivalent of something else: a fair return in goods, services, or money," and as "the monetary worth of something." [49] It would, too, maintain consistency with the identical distinction recognized in Pennsylvania law.[50] At the very least, the insurer's failure to use "replacement cost" at both places in the same sentence in the "provisional amount" clause generates grave doubt as to the meaning of "projected value" in the coinsurance clause—the provision next following in the builder's risk form.

We thus cannot share the District Court's view that the phrase "projected value ... at the time of completion" in the coinsurance clause is unambiguous. Rather, it seems to us that "reasonably intelligent men on considering it in the context of the entire policy [c]ould honestly differ as to its meaning." [51] We accordingly reverse the summary judgment awarded to Fireman's Fund and remand the case to the District Court for further proceedings consistent with this opinion.

So ordered.

---

**48.** Webster's Third New International Dictionary, Unabridged, 1925 (1964).

**49.** *Id.* at 2530.

**50.** Replacement cost "is the actual cost of repair or replacement without deduction for depreciation." *Canulli v. Allstate Ins. Co.,* 315 Pa.Super. 460, 462 A.2d 286, 287 (1983); accord, *Ditch v. Yorktowne Mut. Ins. Co.,* 343 Pa.Super. 22, 493 A.2d 782, 784 (1985). "Market value ... embodies what a purchaser willing to buy feels justified in paying for property which one is willing but not required to sell." *Fedas v. Insurance Co. of State of Pa.,* 300 Pa. 555, 151 A. 285, 288 (1930); accord, *Ditch v. Yorktowne Mut. Ins. Co., supra,* 493 A.2d at 784. *Ditch* is especially

significant. There a homeowner's policy contained a coinsurance clause requiring coverage at 80% "of the full replacement cost of the building." 493 A.2d at 783. Overturning the trial court's holding that "replacement cost" should be interpreted to mean "market value," the Superior Court held that "replacement cost" clearly did not mean "market value." "Replacement cost," it said, means the actual cost to repair or replace, while "market value" means what a willing buyer would pay a willing seller. 493 A.2d at 784. Since "replacement cost" does not mean "market value," we fail *to* see *how* "value" unambiguously means "replacement cost."

**51.** See note 36 *supra* and accompanying text.