Applebaum *v.* Empire State Life Assurance
Society, Appellant.

Argued January 4, 1933.   Before SIMPSON, KEPHART,
SCHAFFER, MAXEY, DREW and LINN, JJ.

222

*Thomas B. Hall,* for appellant.—The insurer is not estopped by an agent's knowledge from setting up the falsity of an answer if the insured was a party to the deception: Gardner v. Ins. Co., 163 N. C. 367; American Ins. Co. v. Gilbert, 27 Mich. 4; Koppleman v. Ins. Co., 302 Pa. 106.

*Frederick J. Shoyer,* with him *Kendall H. Shoyer* and *Manuel Sidkoff,* for appellee.—The parol evidence rule is not applicable in the case of a life insurance policy where it is sought to show the applicant gave truthful answers to the company's representatives, which were incorrectly recorded by them: Meyers v. Ins. Co., 156 Pa. 420; Evans v. Ins. Co., 294 Pa. 406.

OPINION BY MR. JUSTICE LINN, March 20, 1933:

December 1, 1929, defendant issued to Louis Applebaum a $5,000 policy of insurance on his life, naming his wife beneficiary. Less than seven weeks later he died of apoplexy. The company refused payment, alleging breach of warranty. The beneficiary sued and obtained judgment for the face of the policy and interest. Defendant appeals.

By admissions in the pleadings, put in evidence, it is established that prior applications by the insured for other insurance had been rejected, and that he denied the rejection in reply to a question in the application for the policy in suit; that he likewise falsely replied to a request for information about recent treatment by physicians; and that he had also concealed that he had suffered with headaches and high blood pressure.

The medical examiner's report, containing the false statements, is signed by the insured. Over his signature he certifies: "I hereby declare that the above questions were asked me by the Medical Examiner and that I fully understand each and all of them. That the answers made to each of them are true and are hereby warranted to be true and I do hereby, in consideration of the premises, agree that the foregoing examination, and each and every part thereof shall be and become a part of the contract of insurance, and of the beneficiary policy if such be hereafter issued to me......I further agree that all statements, declarations and representations contained in the application for a beneficiary policy subscribed by me herein and that all questions and answers contained in the foregoing shall be the basis upon which a beneficiary policy of said company may hereafter be issued to and held by me."

In his application, also incorporated in the policy, he repeated the denial of former rejections, and signed the following: "I further agree........and warrant the statement contained in this application and the Medical examination hereto annexed to be true in every respect, the same being made to induce the issuing of said Policy by said Society, and to become a part of the contract of insurance and the Beneficiary Policy, herein applied for, when issued."

In the policy "it is mutually understood and agreed, ......that the Application and Medical Examination, copies of which are hereto attached and made a part hereof, form the basis of the liability......"

The prior rejections, and the concealed medical attendance were uncontradicted; they were material to the risk (Koppelman v. Com. Cas. Co., 302 Pa. 106, 153 A. 121; Moncur v. Western Life Ind. Co., 269 Pa. 213, 112 A. 476; American U. Life Ins. Co. v. Judge, 191 Pa. 484, 43 A. 374) and constitute breach of warranty barring recovery.

To support her claim, plaintiff was permitted to put in evidence in rebuttal for the purpose of showing that the insured truthfully answered the questions stated in the medical examination blank, that the examiner did not record the answers made, but filled the blanks with the false denials appearing in it; also, that the agent who took the application for the policy was truthfully informed of the insured's prior rejection but, like the medical examiner, also fraudulently recorded a denial of it. If we understand the positions taken by plaintiff in the argument, they are that the wrongful conduct of both the agent, and the medical examiner, in recording false answers, relieves the plaintiff of the effect of the breach of warranty; that there was no breach of warranty because "there is no limitation of the agent's authority set forth in the printed application," and that, in any event, "the applicant's good faith" was for the jury.

The general rule is that one who signs an application for insurance without reading it, when he might have done so, will be held to have read it. It was applied in Koppelman's case, supra, and in Rinker v. Ætna Life Ins. Co., 214 Pa. 608, 614, 64 A. 82; it is the law in the federal courts: N. Y. Life Ins. Co. v. Fletcher, 117 U. S. 519; and in England: Biggar v. Rock Life Ins. Co. [1902], 1 K. B. 516; Newsholme v. Road Transport, etc., Ins. Co. [1929], 2 K. B. 356. Koppelman might have but did not read the application signed by him, and, in consequence, contended that he was ignorant of a limitation of the agent's power expressed in the application, and was, therefore, not bound by what he had signed; we held that he must be treated as knowing what he

would have learned by reading the application. The scope of the presumption is not restricted to the mere discovery of the limitation of the agent's authority; the applicant is presumed to know all that a reading of his application would have revealed. In Rinker's case, we said: "There is no allegation that the applicant was blind or deaf or that she was unable to read. The statement simply is that she signed the paper without reading it. If she was incorrectly reported therein, it was then her own fault." In Fletcher's case the Supreme Court cited with approval Ryan v. World Mutual Ins. Co., 41 Conn. 168, and said: "The application was signed without being read. It was held that the company was not bound by the policy; that the power of the agent would not be extended to an act done by him in fraud of the company and for the benefit of the insured, especially where it was in the power of the assured by reasonable diligence, to defeat the fraudulent intent; that the signing of the application without reading it or hearing it read, was inexcusable negligence; and that a party is bound to know what he signs." In Newsholme's case, the Court of Appeals said: "In any case a man who has signed, without reading it, a document which he knows to be a proposal for insurance, and which contains statements in fact untrue and a promise that they are true and are to be the basis of the contract, cannot escape from the consequences of his negligence by saying that the person he asked to fill it up for him was the agent of the Insurance Company."

In Mutual Life Ins. Co. v. Hilton-Green, 241 U. S. 613, the court rejected the same contention that plaintiff makes here, saying (page 623): "The general rule which imputes an agent's knowledge to the principal is well established. The underlying reason for it is that an innocent third party may properly presume the agent will perform his duty and report all facts which affect the principal's interest. But this general rule does not apply when the third party knows there is no foundation

for the ordinary presumption—when he is acquainted with circumstances plainly indicating the agent will not advise his principal. The rule is intended to protect those who exercise good faith and not as a shield for unfair dealing [citing cases]."

Those observations are particularly applicable to this record. The only witnesses called were the widow of the insured, and her brother, one, Bell. She was not present when the application was signed. Bell was manager of decedent's business and states that he was present. Applebaum, the insured, was able to read; he was not unacquainted with insurance applications, having two other policies, besides having had experience with other applications. If it became necessary to consider plaintiff's contention that defendant is estopped from insisting on the breaches of warranty or false representation (plaintiff's alternate position) we should be required to hold that the evidence to support the contention is not clear and satisfactory within the rule applied in Suravitz v. Prudential Ins. Co., 261 Pa. 390, 104 A. 754, and Panopoulos v. Met. Life Ins. Co., 96 Pa. Superior Ct. 415, and that plaintiff's case, which fails for breach of warranty, would also fail for that reason. This would follow because Bell's evidence, instead of being clear or satisfactory, is peculiarly unsatisfactory as a basis of confident inference. His recollection is uncertain; he contradicts the documents, or testifies about a different transaction from that under investigation, or is mistaken in material statements. In Pusic v. Salak, 261 Pa. 512, 519, 104 A. 751, we said: "the witness must be credible and the facts distinctly remembered and accurately stated." The application and the medical examiner's report, both signed by Applebaum, were dated November 6, 1929, the date on which they were executed. Notwithstanding that, Bell testifies that the insured signed the application three weeks before. His testimony concerning the signing of the application is not only uncertain, but so indefinite that, after studying it, we have

been unable to understand exactly what he means. He states that the insured signed the medical examiner's report before the examination was completed. Before evidence can be submitted to the jury for the purpose proposed by the plaintiff, the judge must be satisfied that it is clear and satisfactory; unless it reach that standard, it should not go to the jury: Miller's Est., 279 Pa. 30, 38, 123 A. 646. Apparently the agent who presented the application blank to be filled in was named Speiser, though it is not witnessed by him, but by another person who could not have been present if Bell's evidence is correct.

To say the least, there is nothing in the evidence * to support the suggestion that Applebaum did not have the fullest opportunity to know what he signed and the effect of it. The insurance agent neither did nor said anything that interfered with the applicant's reading the application; it was interrupted and stopped, according to Bell, because of a message from the agent's brother apparently given to Applebaum at some prior time over the telephone. Bell also testified that Applebaum told the medical examiner that he had been rejected before, and that "he don't think he will pass"; to which the

---

* Bell was asked in cross-examination: "Q. Was the application read to Mr. Applebaum when he signed it? A. Not all of it. He started to and he signed the application before he read it all to him. Q. Why wasn't it all read to him, if you know? Why was the reading stopped? A. Mr. Speiser's brother was a customer of ours and he told him whatever he would say in there was all right. [This brother was not present.] By the Court: Q. What was that? A. Mr. Speiser's brother was a customer of this place. Q. Of Mr. Applebaum's? A. Mr. Applebaum's, and he told him whatever he said is all right on there. Q. Whatever who says? A. Mr. Speiser, the agent. So he took his word on that and he didn't finish reading it. By Mr. Hall: Q. Then Speiser wrote down the answers, did he, in the application? A. Yes, sir. Q. And then Mr. Applebaum without reading it— A. He took his word. Q. Or asking Mr. Speiser to read it to him, signed it? A. That is right. Q. After Mr. Speiser's brother had told him that whatever he, Speiser, said, would be all right? A. That is right. By the

examiner stated, "Well, we can put you through this company if anybody turned you down." In plaintiff's reply to new matter she avers that "said insured fully advised the medical examiner that he had applied for life insurance in other companies and that he had been rejected by such companies as a suitable risk." Applebaum's knowledge of prior rejection, and of its probable effect on this application (referred to several times in the evidence) considered with Bell's account of why Applebaum did not read what he certified to be correct in the two papers signed by him, makes it appropriate to quote the following: "In Swan v. Watertown Fire Ins. Co., 96 Pa. 37, the insured signed an application which had not been finished. He directed another to fill it up, and expressed doubt as to the manner in which it should be done. It was held that he knew facts to incite him to read the policy and was chargeable with knowledge of its contents, and should, under the circumstances, be presumed to have accepted it as written": Dowling v. Ins. Co., 168 Pa. 234, 240, 31 A. 1087.

In Mutual Life Ins. Co. v. Hilton-Green, supra, it was said, "The assured at the least consciously permitted an application containing material misrepresentations to

Court: Q. Mr. Speiser's brother said that whatever Speiser, the agent, said in the application would be all right; is that what you mean? A. Yes. Q. Was the brother of Mr. Speiser there? A. He called him up when he was coming down, that the agent was coming down. Q. Who called who? A. The agent's brother called up Mr. Applebaum while his brother was coming down and he told him that he is coming down to take this here policy out. Q. How do you know what he said to him? A. Because he spoke to me first. Q. He spoke to you? A. Yes. ...... Q. And on the day when the application was signed by Mr. Applebaum, before it was signed, you want us to understand that Morris Speiser [brother of the agent] called on the telephone? A. That is right. ...... Q. And Morris Speiser said to you what? A. That his brother was coming down to insure him. Q. To insure Mr. Applebaum? A. Yes, and whatever he says will be all right. Q. Whatever his brother, the insurance agent, says, will be all right? A. That is right."

be presented by subordinate agents to officers of the insurance company under circumstances which he knew negatived any probability that the actual facts would be revealed; and later he accepted policies which he must have understood were issued in reliance upon statements both false and material. He could claim nothing because of such information in the keeping of unfaithful subordinates. Moreover, the false representations accompanied and were essential parts of the policies finally accepted. He did not repudiate, and therefore adopted and approved, the representations upon which they were based. Beyond doubt an applicant for insurance should exercise toward the company the same good faith which may be rightly demanded of it. The relationship demands fair dealing by both parties [citing cases]."

Defendant's point for binding instructions in its favor should have been affirmed.

Judgment reversed and here entered for defendant.