In re Mary Ann MORAN, Debtor.

Mary Ann Moran, Plaintiff,

v.

Household Realty Corp. and Alexander Hamilton Life Insurance Company of America, Defendants.

Bankruptcy No. 00–10540DAS.
Adversary No. 00–0170.

United States Bankruptcy Court,
E.D. Pennsylvania.

May 31, 2000.

Robert C. Blackmon, Philadephia, PA, for debtor.

Margaret Gairo, Philadelphia, PA, Joseph Riga, McCabe, Weisberg & Conway, P.C., Philadelphia, PA, Joseph Riga, Whittlesey McDowell & Riga, Maple Shade, NJ, for defendants.

Barbara A. Fein, Fort Washington, PA, for Federal National Mortgage Ass'n.

Edward Sparkman, Philadelphia, PA, trustee.

### OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

## A. INTRODUCTION

The instant adversary proceeding ("the Proceeding") presents the question of whether a credit insurer of a Debtor-mortgagor must make the insured's mortgage payments despite a significant lapse in the Debtor's payment of premiums along with the mortgage payments because the Debtor did not receive a copy of the policy nor notice of the policy's cancellation.

We deny the Debtor's claim against the insurer here because we find that the Debtor "abandoned" the policy by not contacting the insurer to clarify its terms and failed to dispute a wrongful cancellation at any time between 1995 and 2000, as well as making no mortgage payments during that period. Thus, we reject the Debtor's argument that the instant policy should extend indefinitely beyond its terms because it was not properly delivered and notification of its cancellation was never provided to the Debtor.

## B. PROCEDURAL AND FACTUAL HISTORY

Since 1995, MARY ANN MORAN ("the Debtor"), individually or jointly with her late husband, George Moran ("the Husband;" together with the Debtor, "the Morans"), filed for Chapter 13 bankruptcy six times prior to the filing of the Debtor's instant Chapter 13 bankruptcy case. In every instance, these previous cases were dismissed without plan confirmation. Prior to dismissal of the Debtor's sixth Chapter 13 bankruptcy on September 14, 1999, we entered an Order on August 17, 1999, barring the Debtor from filing any further bankruptcy cases for 180 days ("the Bar Order").

The instant case was filed after the Debtor came before us on January 13, 2000, just prior to a foreclosure sale of her home at 111 Frankenfield Rd., Ottsville, PA 18942 ("the Home"), and presented a

motion requesting relief from the Bar Order on the ground that a recovery on an insurance policy ("the Policy") issued by ALEXANDER HAMILTON LIFE INSURANCE COMPANY OF AMERICA, now known as Household Life Insurance, Inc. ("the Insurer"), a company owned by one of two mortgagees against the Home, HOUSEHOLD REALTY CORP. ("the Mortgagee;" together with "the Insurer, the Defendants"), would allow her to successfully fund a Chapter 13 bankruptcy plan. Prior to the Debtor's request for relief from the Bar Order, despite her string of cases, the Debtor had never initiated any action to enforce the Policy.

In an order of January 13, 2000, we granted the Debtor one more opportunity to file yet another Chapter 13 bankruptcy case, but further stated that the Debtor must resolve any disputes with the Defendants or her other mortgagee in that further case, or suffer dismissal of that case with a 180-day bar on future filings.

In response, the instant Chapter 13 bankruptcy case was filed by the Debtor on January 13, 2000. On January 14, 2000, we entered an order scheduling a status hearing to enforce the conditions set forth in our prior orders on February 1, 2000. After a continuance of that status hearing to February 15, 2000, the Debtor, on February 14, 2000, filed an objection ("the Objection") to the Mortgagee's proof of a total claim of $102,994.29 and arrears of $47,253.37, on the ground that it was covered by insurance. On February 15, 2000, we entered an order requesting the Debtor to file and serve a proceeding to resolve her disputes with the Defendants by February 25, 2000, and to list same for trial on April 11, 2000.

In response, the Debtor filed the instant Complaint for Breach of Contract ("the Complaint") against the Defendants in the Proceeding, demanding damages of $150,-000. Therein the Debtor argued that the policy should cover the total debt owed to the Mortgagee because of the Husband's disability and death. Further, she contended that the Defendants were responsible for the mortgage debt because they never notified the Debtor that the Policy was canceled.

The Defendants filed an Answer to the Complaint on March 29, 2000, alleging that the Morans had never applied for, nor been issued, disability insurance. Further, they stated that the life insurance policy covering only the Husband was canceled by its express terms on July 21, 1995, when premium payments were three months delinquent. The hearing on the Objection was continued to the date of the trial of Proceeding on April 11, 2000, and, after the trial and hearing, both parties were directed to simultaneously submit opening briefs by May 5, 2000, and reply briefs by May 15, 2000.

It was established at trial that the Morans financed a Revolving Loan and Collateral Pledge Agreement ("the Agreement") with the Mortgagee on September 1, 1988, in the amount of $70,000, executing a mortgage on the Home to secure the payments. On September 7, 1988, at the loan settlement, the Morans were solicited in connection with the Agreement and proceeded to execute a contract of insurance in conjunction with the Agreement entitled "Optional Credit Insurance Disclosure" ("the Disclosure") and "Creditor–Debtor Outstanding Life Insurance Policy" ("the Policy"). The Policy set forth alternative types of insurance coverage offered, including "single life insurance," "joint life insurance," and "single life insurance and disability." The executed documents stated that the Morans opted to apply for only single credit life insurance for the Husband.

The Insurer subsequently notified the Husband that a single credit life insurance policy was approved in a letter dated September 24, 1988. The Debtor testified that the Morans never received a copy of the Policy from the Insurer, and the letter does not reflect that a copy was enclosed with it.

At trial, the Debtor conceded that she had read and signed the Disclosure stating that the coverage requested was life insurance covering the Husband only. Nevertheless, she argued that there was an oral agreement between the Defendants and the Morans that both husband and wife would obtain life insurance and that the Husband would also obtain disability coverage. We note that information relating to the Husband only appears on a Medical Application for Credit Insurance, although space is provided for a joint applicant to also complete the application. Because the Debtor conceded that she signed the Disclosure and she offered no documentary evidence to support her claim of broader coverage, we find that the only coverage provided was insurance on the Husband's life.

The Morans began making monthly payments under the Agreement, which included the monthly premium payments for life insurance benefits for the Husband only pursuant to the Policy. After the Husband became ill in 1995, the Morans became delinquent in their payments. According to the Defendants, the Policy was automatically canceled on July 20, 1995, pursuant to the fourth paragraph of the Policy, which provides as follows:

WHEN INSURANCE STOPS

*This insurance automatically stops:*

1) on the last day of the billing cycle in which we receive your written request to stop the insurance; or

2) on the date your account with the Creditor is closed; or

3) on the last day of the billing cycle in which you reach Age 66 and you receive prior written notice of cancellation during your lifetime; provided no claim was incurred prior to that date; or

4) *on the last day of the billing cycle during which you are 3 months delinquent in payment of a monthly premium for this insurance;* or

5) on the last day of the billing cycle in which you receive written notice of cancellation; or

6) on the date of your death (emphasis added).

The Debtor testified that the Husband became disabled on or about November 22, 1995. She further stated that she contacted the Mortgagee's office to report his disability in January, 1996. The Mortgagee denied any record of this call. The Debtor did not aver that she made any further inquiries as to whether the Policy would cover the mortgage payments. All payments on the Agreement ceased in early 1997.

The Husband died on March 28, 1998. The Debtor alleged that she again contacted the Mortgagee's office in 1998 to give it notification of the Husband's death. The Mortgagee denied any record of this call as well. The Debtor testified that she never received a notice of cancellation of the Policy. Thus, she argued that it was reasonable for her to believe that the Policy was still in effect. The Mortgagee admitted that no notice of the Policy's cancellation was sent, but further contended that the Policy clause quoted at page 94 *supra* provided for its automatic cancellation and thus rendered such notice unnecessary.

C. *DISCUSSION*

The Debtor, in her post-trial submissions, raised several issues. In her initial brief, the Debtor argued that the Policy was a "group policy" and that 31 PA. CODE § 73.128(c) required notice of cancellation of a "group policy." Further, she contended that, since she did not receive a copy of the Policy nor notice of its cancellation, coverage should extend beyond its express terms and remain in effect indefinitely.

The Defendants began their opening brief by urging us to find the Debtor's claim has no basis and merely represents a desperate attempt to avoid foreclosure

proceedings of the Home. They proceed to argue that the Policy was not a "group policy;" that it was in fact delivered to the Morans; that the Debtor failed to meet her burden proving that the Policy was still in effect; that the Debtor's claim was untimely and her conduct reflected an intent to abandon the Policy; and that cancellation was proper according to the express terms of the Policy.

In her reply brief, the Debtor contended that we should find that the burden of proving proper delivery of the Policy was on the Insurer; that she could not be found to have abandoned the policy because she was never apprised of its express terms; and that, since cancellation was not proper, the Policy should remain in effect.

1. *The Insurer's Failure to Provide a Copy of the Policy Does Not Necessarily Render It Perpetually Liable on the Policy.*

 Pennsylvania law requires that a copy of a credit life or disability insurance policy must be delivered to the insured party within thirty days after the date that the indebtedness is incurred. 40 P.S. §§ 1007.6(a), (c). However, the statute does not indicate that the penalty for failing to deliver a policy is to provide a perpetual, paid-up policy to the insured. *Walsh v. Aetna Life Ins. Co.*, 352 Pa. 429, 438, 43 A.2d 102, 106 (1945). Rather, the applicable statute, at 40 P.S. § 1007.14, only appears to authorize the Insurance Commissioner to impose a monetary penalty on the insurer for such a violation of the law.

 Actual delivery of a policy to the insured is not necessary to create a binding insurance contract. *Long v. North British & M.F. Ins. Co.*, 137 Pa. 335, 349–51, 20 A. 1014, 1015–16 (1891); and *Pennsburg Mfg. Co. v. Pennsylvania Fire Ins. Co.*, 16 Pa.Super. 91, 97 (1901). The only instance where actual delivery is required to create a valid contract is when a provision expressly set forth in the policy's

terms so requires. *Levan v. Pottstown–Phoenixville Ry.*, 279 Pa. 381, 384–85, 124 A. 89, 90 (1924). Thus, an insurance policy can be in force even though proper delivery of the policy to the insured was not made. *Id.* Evidence that may prove the existence of a valid contract includes an insurance application, notice the application was approved, or proof that the insured made premium payments that were accepted by the insurer. *Id.*

In the instant case, we find that the Defendants did not prove that the policy was properly delivered to the Morans pursuant to 40 P.S. to § 1007.6(a). The Insurer presented no evidence to rebut the Debtor's testimony that the Policy was in fact not delivered to the Morans at any time. The Defendants urge us to follow the purported "general rule" that an insurance policy is presumed to have been delivered to the insured's home address when evidence of delivery is inconclusive. *Buhonick v. American Fidelity & Casualty Co.*, 190 F.Supp. 399, 401 (W.D.Pa.1960); and *Crawford v. Manhattan Life Ins. Co.*, 208 Pa.Super. 150, 154, 221 A.2d 877, 880 (1966). This rule, however, only arises in these cases in instances where the place of delivery is disputed and the issue is a question of which state's law should apply. Thus, it is not applicable here because this dispute concerns whether the Policy was delivered at all.

Rather than disputing coverage because of non-delivery of the Policy, the Debtor's case is premised on the assumption that there was a valid insurance contract between the parties despite its non-delivery. The Defendants concurred that there was a binding insurance contract between the parties at some point. Thus, the Defendants produced the Husband's medical application for insurance and a copy of a letter informing him that his application was approved. Since it is not disputed that the Morans made monthly premium payments between 1988 and 1995, the parties clearly entered a valid contract for insurance which was in effect for that peri-

od. However, because the terms of the policy do not explicitly require delivery for it to be effective, the Court finds delivery was not required to create a contract binding the parties under at least certain to its terms.

### 2. Despite the Absence of Delivery of the Policy, the Debtor Must Be Bound to Such Terms As One Would Reasonably Expect to Find in a Life Insurance Contract.

The Debtor does not allege that the Policy contract is invalid in its entirety because she was not aware of its express terms. Indeed, it has been held that " 'one who signs an application for insurance without reading it, when [she] might have done so, will be held to have read it.' " *Equitable Life Assurance Society v. McCausland,* 331 Pa. 107, 109, 200 A. 85, 86 (1938), quoting *Applebaum v. Empire State Life Assurance Society,* 311 Pa. 221, 224, 166 A. 768, 769 (1933). Moreover, the payment of premiums is of the very essence of an insurance contract. *Kehoe v. Automobile Underwriters, Inc.,* 12 F.Supp. 14, 15 (M.D.Pa.1935). Premium payments are "a condition precedent to or at least concurrent with the assuming of any liability by an insurance company." *Id.* at 16. Thus, an insured is charged with notice of policy terms regarding cancellation for nonpayment of premiums. *Id.*

In the instant case, we disagree with the Debtor's implicit assertion that it was reasonable for her to believe that a life insurance policy was in effect when no premium payments were made between 1995 and her husband's death in 1998. The cancellation provision for nonpayment of premiums was neither ambiguous nor inconspicuous, nor did the Debtor argue that she was not given the opportunity to read the insurance documents signed at the mortgage closing.

We need not now address the far closer question of whether the Debtor could be held to all of the exacting terms of a policy of which we found that the Debtor never

received a copy. The term at issue, at bottom requesting premium payments for the Policy to remain effective, was not exacting. Rather, we find that the Debtor should have assumed that it was necessary to make premium payments for the Policy to remain properly in effect. The Debtor admittedly paid the premiums in timely fashion only until some time in 1995, and made no mortgage payments at all after early 1997. It therefore follows that she certainly had not paid for life insurance coverage through the Husband's death in 1998. Thus, we find that the Debtor should reasonably have assumed that she was obliged to continue to make payments to retain the benefits of the Policy and that it was reasonable for both parties to assume that the Policy coverage lapsed when she failed to do so.

### 3. The Debtor Abandoned the Policy by Failing to Remain Attentive to Its Continued Effectiveness.

An insured may abandon "all right, title and interest in and to [a] policy." *Walsh, supra,* 352 Pa. at 437, 43 A.2d at 106 (1945). In *Walsh,* the insured received a notice in June, 1934, incorrectly stating the amount due on a life insurance policy. 352 Pa. at 436–37, 43 A.2d at 105–06. However, where no premium payments were made after the June notice and before the insured's death in 1941, the court held the policy had ceased because it had been abandoned. 352 Pa. at 437–43, 43 A.2d at 106–08.

A similar result ensued in *Mandel v. Scranton Life Ins. Co.,* 359 Pa. 256, 57 A.2d 851 (1948). There, an insured's premium checks were returned to him in 1936, along with a letter stating that his policy would not be reinstated because of his failure to submit to a new physical examination. 359 Pa. at 258, 57 A.2d at 852. Thereafter, the insured became disabled in 1938. *Id.* However, it was not until 1942 that he made a claim against the insurer. *Id.* The court held that, because the insured had remained passive for six years

and in no way disputed the insurer's right to terminate the policy during that period, the only reasonable conclusion was that the insured acquiesced in the action of termination and abandoned the policy. 359 Pa. at 260, 57 A.2d at 853.

█ It was the Debtor's burden to establish a valid loss covered by the policy. *Riehl v. Travelers Ins. Co.*, 772 F.2d 19, 23 (3d Cir.1985). Thus, it was the Debtor's responsibility to continue to pursue her rights under the Policy after she became delinquent in the payments of premiums in 1995. When the Insurer claimed that the policy's coverage ceased in July, 1995, payments were already more than three months delinquent. Premiums were thus clearly not maintained through the date when the Husband became disabled in November, 1995, let alone when he died in 1998. It was not reasonable for the Debtor to assume that both she and the Insurer agreed that insurance remained properly in effect even though premium payments were not even made for such an extended period.

In her reply brief, the Debtor argued that abandonment should not lie because there was no evidence supporting the conclusion that she intended to abandon the Policy. We find that the Debtor manifested the requisite intent to abandon the Policy by failing to take any affirmative action whatsoever, either to inquire if the insurance was still in effect, for that reason becoming unable to understand that she was obliged to allege that the policy was wrongfully canceled; or whether it could be reinstated during the time for the very lengthy period from when premium payments became delinquent in 1995 until the Proceeding was filed in January, 2000.

Further, we note that the Debtor had filed individually for bankruptcy three times since the Husband's death prior to the instant case. There was no evidence that, in the course of these cases, she ever alleged that her obligation to the Mortgagee was covered by a life insurance policy.

Because the Debtor remained completely passive regarding any rights under the Policy for a very extensive period in which she was in and out of this court and was therefore in a position to raise such issues, it was reasonable for the Defendants to conclude she had acquiesced in the termination of the Policy and hence had abandoned her claims under it. We therefore find that the record also supports the conclusion that the Debtor abandoned any claim under the Policy, either due to the Husband's disability or to his death.

*4. Unilateral Cancellation of the Policy by the Insured Without Notice to the Debtor Was Permissible Because It Satisfied the Express, Reasonable Terms of the Policy.*

█ "The general rule in Pennsylvania is that, in absence of a countervailing statute, a right of cancellation in an insurance policy is effective according to the terms of that policy." *Counties Contracting & Construction Co. v. Constitution Life Ins. Co.*, 855 F.2d 1054, 1061 (3d Cir.1988). *See also Hanna v. Reliance Ins. Co.*, 402 Pa. 205, 166 A.2d 877 (1961).

█ An insurance contract generally requires both parties' consent before it can be properly canceled. *Slater v. General Casualty Co. of America*, 344 Pa. 410, 414, 25 A.2d 697, 698 (1942). Where the right to cancel is expressly given to one party, the burden is on that party to prove it complied with all of the policy terms relating to cancellation. *Hanna, supra*, 402 Pa. at 205, 166 A.2d at 879. It is true that, whenever a policy term is ambiguous, it must be construed against the insurer as the party who was responsible for drafting the policy. *Bateman v. Motorists Mutual Ins. Co.*, 527 Pa. 241, 245, 590 A.2d 281, 283 (1991), citing *Standard Venetian Blind Co. v. American Empire Ins. Co.*, 503 Pa. 300, 469 A.2d 563 (1983). However, where the terms of the policy are "clear, plain and unambiguous, ... the rule that they are to be construed most strongly in favor of the insured does not apply." *Farmers*

*Trust Co. v. Reliance Life Ins. Co.*, 140 Pa.Super. 115, 121, 13 A.2d 111, 115 (1940). *See also Lucas v. John Hancock Mutual Life Ins. Co.*, 116 Pa.Super. 298, 176 A. 514 (1935).

In the instant fact situation, we find that there is no countervailing statute that prevails over the express terms of the Policy. The Debtor urges us to apply a provision of the Pennsylvania Code, which states that

> [i]f a debtor is insured under a group credit insurance policy providing for the payment of premiums to the insurer on a monthly premium basis, the insurer shall, in the event of termination of the policy, cause a notice to be provided to the insured debtor at least 30 days prior to the effective date of termination.

31 PA.CODE § 73.128(c). Although it is undisputed that the Morans were not notified prior to the Policy's cancellation, the testimony at trial did not clearly reveal whether the Policy in question was an individual or a group policy.

In their reply brief, the Defendants point out that the Regulation relied upon by the Debtor was not effective until July 20, 1998, 28 PA. BULLETIN 1401, 1408 (March 21, 1998), long after the Policy was canceled. Further, they note that, in a "group policy" situation, the policy is issued to one entity (such as an employer or a lender) who, in turn, issues certificates to third parties (such as employees or borrowers) entitling them to receive a participation in the benefits under the group policy, citing F. BEST, PENNSYLVANIA INSURANCE LAW, Chapter 19 (Group Life Insurance), 1–12 (2d ed.1998). Thus, the Defendants argued that this Code provision was enacted to assure that an insurer provides notice of cancellation to the third party debtors when the policy issued to the insured party, who is an employer or a lender, is to be canceled.

Arguing that the instant Policy is an individual policy, as opposed to a group policy, the Defendants note that 31 PA. CODE § 128(a) provides as follows:

> An individual policy of credit insurance may not be terminated by the insurer, *except for nonpayment of premium*, prior to the scheduled expiration date of the policy . . . . (emphasis added)

Thus, if the Policy was an individual policy, cancellation without notice was not impermissible according to the applicable Regulation or the Policy's terms.

Cases interpreting laws of other jurisdictions indicate that the purpose of statutes or regulations requiring notice to insureds prior to cancellation of an insurance policy is to prevent cancellation of insurance policies when the premium due dates are unintentionally overlooked. *See Mutual Life Ins. Co. of New York v. Hill*, 193 U.S. 551, 559–61, 24 S.Ct. 538, 48 L.Ed. 788 (1904) (courts will not grant relief where insurance companies collected premiums and sought to avoid payment by technicalities; however an insured may not exact payment from the insurer when premiums were deliberately left unpaid). Similarly, they recognize that, when an insured inadvertently misses a premium payment by several days, it would be unjust to require a medical examination to reinstate the policy. *See Swayze v. Mutual Life Ins. Co.*, 32 F.2d 784, 786 (D.Kan. 1929); *Lone v. Mutual Life Ins. Co.*, 33 Wash. 577, 74 P. 689 (1903) (purpose of such statutes is to prevent an insured from being deprived of insurance because of slight negligence, where there was no real intent to rescind).

Moreover, our analysis of the issue of abandonment of the Policy causes us to conclude that the instant facts do not require us to reach the issue of whether the Insurer fulfilled its statutory duty regarding cancellation of the Policy to escape liability. We found, at pages 96–97, *supra,* that the Debtor manifested her intent to abandon the policy by failing to allege a wrongful cancellation at any time between 1995 and 2000. It would violate the purpose of any regulation or statute requiring

pre-cancellation notice to apply it to a situation which is clearly not an instance where a temporary oversight or slight negligence resulted in a policy lapse.

Because we find that there is no countervailing statute or regulation applicable, the prevailing rule is that cancellation is effective according to the Policy's terms. The Policy clearly states, see page 94 *supra*, that it will automatically be canceled if the insured is delinquent in three premium payments. The policy does not provide for notice to be given prior to cancellation. As the Debtor notes, the Morans did not have the option to reinstate the Policy. However, the Policy's terms do not provide for an offer of reinstatement.

It was not disputed at trial that the Morans stopped making their premium payments. Thus, the Court finds the Defendants satisfied their burden of proof of valid cancellation of the Policy by showing that the Insurer properly canceled the insurance after the Morans were three months delinquent with premium payments.

## D. *CONCLUSION*

In light of the foregoing, we will proceed to enter judgment in favor of the Defendants in the Proceeding. We will also proceed to overrule the Objection, which appears dependent on an outcome of the Proceeding favorable to the Debtor. The impact of this decision upon the Debtor's now bleak prospects for plan confirmation and the provisions of our Order of January 13, 2000, will, even in the absence of any motion by any interested creditor, be reviewed by us at the scheduled initial confirmation hearing on July 6, 2000.